## COMMONWEALTH vs. BRUCE OLIVER WAITE.

Hampden. November 9, 1995. - May 31, 1996.

Present: LIACOS, C.J., WILKINS, ABRAMS, O'CONNOR, & GREANEY, JJ.

*Evidence*, Admissions and confessions, Expert opinion, Medical record. *Constitutional Law*, Admissions and confessions. *Practice, Criminal*, Argument by prosecutor, Instructions to jury, Assistance of counsel. *Homicide. Malice. Mental Impairment. Intoxication.*

At a criminal trial, brief testimony regarding the defendant's assertion of his right to remain silent after he was arrested and given Miranda warnings and had made certain statements was properly admitted where it was not offered to promote an inference of guilt or to impeach the defendant's story. [797-800]

At a murder trial at which the defendant did not testify, improper prosecutorial argument using the defendant's postarrest post-Miranda denial of knowledge of the crimes and asserting that the defendant was a "liar" was harmless beyond a reasonable doubt where the evidence against the defendant was overwhelming. [800-802]

At a murder trial the judge properly excluded as a basis for a forensic psychologist's opinion a tentative and preliminary psychiatric diagnosis of the defendant by another psychiatrist made shortly after the defendant's arrest. [802-804]

At a murder trial in which the jury found the defendant guilty of two indictments of first degree murder tried on the theory of deliberate premeditation, there was no reversible error in the judge's definition of the third prong of malice which could not have been the basis for the jury's verdicts. [804-805]

At a murder trial, the judge's use of "finding" language in his instructions to the jury on voluntary intoxication and mental impairment was not reversible error where the charge as a whole repeatedly and clearly emphasized the Commonwealth's burden of proof beyond a reasonable doubt on every element of murder [805-806], nor did the judge's use of such language in his instructions regarding the insanity defense shift the burden of proof to the defendant, in light of the charge as a whole [806-807].

No ineffective assistance of trial counsel was demonstrated on appeal from convictions of murder in the first degree, and certain claims of ineffective assistance of trial counsel were not properly before this court where they had not been raised in a motion for a new trial. [807]

No reason appeared on review of murder convictions for this court to exercise its power under G. L. c. 278, § 33E, to order a new trial or to reduce the verdicts. [808]

INDICTMENTS found and returned in the Superior Court Department on April 27, 1990.

A pretrial motion to suppress evidence was heard by *John F. Moriarty*, J., and the cases were tried before *John F. Murphy, Jr.*, J.

*John M. Thompson* for the defendant.

*Jane Davidson Montori*, Assistant District Attorney, for the Commonwealth.

LIACOS, C.J. At approximately 9:30 A.M. on April 17, 1990, the defendant, Bruce Oliver Waite, drove to his sister's house in Springfield. There, his niece, Stacy Green, asked for a ride to a nearby bus stop. Waite agreed. While they were in his Jeep, Waite asked Green if she knew of any boy friend that Waite's estranged wife, Joan Waite, might have. Green replied she knew of no one. Waite stated that he had seen Joan Waite's new boy friend a few days earlier, driving by and acting "like a smartass." Waite told Green that he "had something" for the boy friend. Shortly after 9:30 A.M., Waite and Green returned to his sister's house. Waite attempted to persuade Claude Green, Stacy's cousin, to go out for a drink, but he declined. Claude Green later testified that he saw Waite pacing in the house, then heard a rustle of papers in a bedroom where a rifle was kept, and finally heard Waite driving away in his Jeep.

Around 10 A.M., Waite arrived at the local K-Mart store where Joan Waite worked. According to store employees, Waite walked around the store apparently looking for someone. He stopped to browse through fishing gear and rifle ammunition. At approximately 11 A.M., Waite approached a cashier and asked about Joan. The cashier did not know Joan by name, but she told Waite that Joan was not working that day. Waite left the store.

There was some evidence that Waite loitered in the K-Mart parking lot for some time. Joan was in fact working that day, and had punched out at 12:55 P.M. to go to lunch with her boy friend, Homer Gadson. Four witnesses reported events beginning at 1 P.M. on Fernbank Road, behind the Eastfield Mall in Springfield. Waite's Jeep Scrambler was seen bumping into another automobile and forcing it off the road. In that automobile were Joan Waite and her boy friend. After the automobile hit a tree, Waite pulled up nearby. Gadson approached Waite's Jeep on foot. Waite fired a rifle (the same

rifle usually kept in Waite's sister's home) and wounded Gadson. Waite then emerged from his Jeep, went up to the other vehicle, and fired a rifle shot that hit Joan in the head and killed her. As Gadson attempted to flee, Waite pursued him into a nearby field. Gadson tripped and fell to the ground. Waite then shot Gadson in the head from close range and killed him. Waite unhurriedly walked back to his Jeep and drove away.

These facts essentially were uncontroverted.[1] Most of the trial involved questioning by the prosecution and the defense, of virtually every witness, as to any evidence that Waite was intoxicated before and during the time of the killings. There was evidence that Waite had been drinking since 8 A.M. that morning. However, other witnesses testified to seeing Waite before the crime, or driving about after the killings. These witnesses related their impressions as to Waite's unhampered ability to operate a vehicle. Several of Waite's relatives provided a history of Waite's alcoholism. The defense put on two experts who testified, both in general and with respect to Waite, regarding the effects of alcoholism and intoxication on his mental state.

After a six-day trial a Hampden County jury returned two verdicts of guilty cf murder in the first degree. Waite appeals. We affirm.[2]

1. *Post-Miranda interrogation.* Waite's primary strategy at

---

[1]There was some half-hearted attempt by trial counsel to suggest that all the witnesses misidentified Waite, but the main defense was lack of intent or lack of criminal responsibility.

[2]The jury also returned guilty verdicts on two indictments charging assault and battery by means of a dangerous weapon (the Jeep), G. L. c. 265, § 15A (1994 ed.); one indictment charging unlicensed carrying of a firearm, G. L. c. 269, § 10 (*a*) (1994 ed.); and one indictment charging unlicensed possession of ammunition, G. L. c. 269, § 10 (*h*) (1994 ed.). We consolidate our consideration of the errors assigned thereto with our statutorily mandated review of the murder charges. See, e.g., *Commonwealth* v. *Lawrence*, 404 Mass. 378, 379 n.1 (1989). The only separate argument proffered to us, that the evidence was insufficient to support the assault and battery convictions, is meritless, and we affirm these convictions. The trial judge did misinstruct regarding the elements of that offense, adding a requirement that the jury find specific intent to do bodily harm with the dangerous weapon. Such specific intent is not required; hence, the charge given was more favorable to the defendant than required. See *Commonwealth* v. *Appleby*, 380 Mass. 296, 305-306 (1980). Nevertheless the evidence, considered most favorably to the Commonwealth, was sufficient to persuade

trial was to show that he had a mental impairment stemming from a combination of voluntary intoxication at the time of the killings, borderline retardation, and brain damage caused by alcoholism. The contention was that he could not form the requisite mental state to commit premeditated and deliberate murder.

The prosecution produced, in its case-in-chief, evidence that Waite was neither irrational nor intoxicated, and therefore was capable of cold, calculated murder. Several witnesses testified to Waite's actions and appearance in the time before and during the killings. Three Springfield police officers described subsequent events around the time of arrest and booking. Evidence of these postcrime events was intended to show that Waite was fully rational at the time of arrest, implying that he was rational (and could premeditate) at the time of the killings.

The testimony of the arresting officer, Sergeant Fournier, forms the first part of what the defendant claims was impermissible use of his post-Miranda silence. See *Doyle* v. *Ohio*, 426 U.S. 610 (1974). The officer testified that while he was proceeding to the scene of the crimes he received a report that the suspect's vehicle was on Rosewell Street. When that radio call came, Sergeant Fournier was on a street adjacent to Rosewell. He changed his destination. He was the first officer to arrive at Rosewell Street. Stepping from his cruiser he saw Waite getting out of the Jeep that had been identified by witnesses to the shootings. Fournier ordered Waite to get down on the ground. The remainder of the testimony, describing the arrest and Waite's reactions thereto, is recounted in the margin.[3]

---

a reasonable jury beyond a reasonable doubt of the defendant's specific intent. See, e.g., *Commonwealth* v. *Phoenix*, 409 Mass. 408, 430 (1991).

[3]Sergeant Fournier's testimony proceeded:

THE PROSECUTOR: "And when you approached this individual in the jeep, what did you do?"

THE WITNESS: "I exited my vehicle. And I approached the subject. I took my gun out, approached him. He stepped from his vehicle and turned and looked at me and I told him to get down to the ground."

THE PROSECUTOR: "Did he do so?"

THE WITNESS: "He did."

THE PROSECUTOR: "What did you next do?"

The prosecution called as its next witness Springfield police Detective O'Connor, who helped transport the defendant to

THE WITNESS: "That very moment I questioned him as to where the gun was that was used on Fernbank Road."

THE PROSECUTOR: "What did you say?"

THE WITNESS: "I asked him where the gun was."

Defense counsel objected to this answer, and to anticipated testimony that would reveal post-Miranda statements. The judge overruled the objection, apparently on the ground that the pretrial motion judge had denied a similar motion in limine. The defendant has not appealed the ruling that this first question to Waite was permissible within the public safety doctrine of *New York* v. *Quarles,* 467 U.S. 649, 657-659 (1984). The questioning continued:

THE PROSECUTOR: "Again, focusing your attention sir, what did you say to the defendant and what did he say to you?"

THE WITNESS: "I asked him where the gun was. He said I don't have any gun."

Sergeant Fournier then described the manner in which he, for security reasons, immobilized and handcuffed the defendant, placed him in a police cruiser, and drove a short distance to the police station.

THE PROSECUTOR: "Did you have any further conversation with the defendant?"

THE WITNESS: "I did."

THE PROSECUTOR: "Can you tell the members of the jury what that was?"

THE WITNESS: "Waite asked me what he was being arrested for. I said that before I talk to you I want to give you your Miranda rights. I verbally gave him his Miranda rights. Then he asked me again, and I said here that you're a suspect in a double shooting on Fernbank Road. I don't know where Fernbank Road is, he said, and I explained to him it was behind Eastfield Mall.

"He still said no, I wasn't there today. I said where have you been the last hour? Just riding around. I was on Boston Road. I stopped at One Stop Package Store, then, I stopped and got a couple of beers.

"Then I asked him again about where the gun was. And he just wouldn't talk at all and because there were witnesses to this, I decided not to question him any further and he just sat there looking out the window and no more questions were asked of him."

On redirect the prosecutor elicited some of Sergeant Fournier's observations of Waite, in order to show that Waite was lucid and comprehending events rather than intoxicated. That line of questioning included one question and answer of which Waite now (although not at trial) complains:

THE PROSECUTOR: "Did he fail to respond to any of your commands?"

THE WITNESS: "Up to the point he just decided not to talk at all, no."

the police station. Detective O'Connor testified to Waite's sobriety and ability to understand and follow directions given by the police at the station. In the course of his testimony Detective O'Connor related that the defendant had no trouble understanding directions as police led him to an interrogation room. Then the prosecutor asked, "How long was he in that room that you next brought him to?" The judge sustained an objection to this question, and the prosecutor did not ask any more questions related to the interrogation room.

One final incident allegedly contained reversible *Doyle* error. In its closing the defense argued that Waite's mental impairment prevented him from being able to commit premeditated murder. The prosecution in turn argued that Waite's actions around the time of the killings evidenced a calculated plan and rationality consistent with premeditation. Part of this argument, Waite contends, improperly commented on his right to remain silent.

A defendant's silence after the police have given the warnings mandated by *Miranda* v. *Arizona*, 384 U.S. 436, 467-479 (1966), may not be used against that defendant. *Doyle, supra* at 617, 619. So far as the Federal Constitution is concerned, the government is barred from using post-Miranda silence against a defendant, even to impeach his trial testimony, for, as *Doyle* holds, to do so would "penalize" the invocation of the right to silence.[4] Of similar import is our holding in *Commonwealth* v. *Person*, 400 Mass. 136, 140 (1987), that it was reversible error for a trial judge to allow a prosecutor to argue in rebuttal that the defendant's consciousness-of-innocence defense was not consistent with the defendant's request for a lawyer in response to the Miranda warnings. *Id.*

---

[4]We note that, unlike *Doyle*, Waite did not testify at trial. The Commonwealth argues that the "silence" that was testified to was not silence in the relevant sense, but rather a mere omission from Waite's voluntary post-Miranda statements to police. This argument depends heavily on our cases that require some affirmative behavior to reassert the right to silence once a defendant begins speaking. See *Commonwealth* v. *Selby*, 420 Mass. 656 (1995), and cases cited. One thing is clear from the police officer's testimony — even he believed that Waite had decided to stop answering questions. Whatever Waite did, it was enough affirmative behavior to make things clear to a police officer involved in the immediate postcrime investigation. Waite's silence was therefore not an omission from the prior statements, but rather the termination of the prior statement and reassertion of rights.

at 141-142. Compare *Commonwealth* v. *LeFave*, 407 Mass. 927, 939 (1990) (prosecutor has "right of retaliatory reply" that can justify use of some otherwise prejudicial evidence or closing argument).

The sine qua non of a *Doyle* violation is the government's *use* of the defendant's silence against him. *Greer* v. *Miller*, 483 U.S. 756, 763 (1987). Still, in a few situations evidence of silence is properly admitted because it is not "used against" the accused. See *Commonwealth* v. *Habarek*, 402 Mass. 105 (1988). In *Habarek* the prosecution had the arresting officer testify at trial. The officer properly had given Miranda warnings to the accused, and the accused in turn gave answers to some initial police questions. At some point during interrogation the defendant reasserted his right to remain silent and ended the questioning. *Id*. at 109. See *Miranda, supra* at 473-474; *Commonwealth* v. *Lewis*, 374 Mass. 203, 205 (1978). The officer so testified, but we noted that evidence of the reassertion of rights was not offered to promote an inference of guilt or to impeach the defendant's story. Rather, one statement on direct examination simply put an abruptly concluded conversation in context. Redirect testimony regarding silence merely responded to cross-examination that tried to portray the silence itself as evidence of improper interrogation techniques of the police. *Habarek, supra* at 110.

The questioning here was similar. The testimony regarding Waite's silence developed from proper testimony about Waite's statements. The first statement fell within the public safety exception of *New York* v. *Quarles*, 467 U.S. 649 (1984), and Waite initiated the conversation that occurred before Miranda warnings were given. As to post-Miranda statements, Sergeant Fournier conducted a short interrogation that, without an explanation as to why it ended, would appear stilted and might confuse the jury. In contrast to the right to present a defense, see, e.g., *Person, supra*, a defendant has no right to create confusion. When the defendant has temporarily waived the right to silence, testimony regarding the cessation of questioning is appropriate to prevent such confusion. There is no prejudice because nothing to which the defendant is entitled is lost.

We do not suggest that direct testimony during the government's case is appropriate in every case in which a defendant initially answered questions and then terminated an

interview. The *Habarek* case is instructive. In that case defense counsel played an important role in starting the confusion by specifically raising the topic of the confusing statements and silence. Here the defendant began the conversation (far different from a typical confession), and thus played a role in creating the confusion.[5]

Turning to Detective O'Connor's testimony, the infirmity complained of is identical to that in *Miller, supra,* so far as Federal constitutional protections are concerned. In that case a prosecutor's question that implicated post-Miranda silence, when quickly objected to, when no answer was given, and with forceful curative instructions, did not create a *Doyle* violation or error. *Miller, supra* at 764-765. When the prosecutor asked Detective O'Connor about the length of time Waite spent in the interrogation room, defense counsel immediately and successfully objected before the witness could answer. No testimony regarding the silence was offered. The improper question did not so obviously implicate Waite's silence as did the improper question in *Miller.* We perceive no error in the judge's decision simply to uphold the objection and call no

[5]In most cases a defendant's inculpatory statement that terminates in the middle of interrogation will contain enough information that the questioning appears complete to jurors. Furthermore, in providing for the admissibility of many confessions trial judges will undertake voir dire to determine the voluntariness of the statements. During that voir dire prosecutors and judges must make efforts to discern ways to present the questioning as complete, so as to prevent the need to explain a seemingly abrupt end to interrogation. See *Wainwright* v. *Greenfield,* 474 U.S. 284, 295 & n.13 (1986) (carefully framed questions can accomplish same task as comment on silence). The case before us involves the somewhat rare situation where statements that are not a confession become admissible (e.g., pursuant to the public safety exception).

Sergeant Fournier's comment during redirect examination may exemplify another important situation where silence is not "used against" the defendant. The prosecutor asked a question about physical responses to police commands, and the witness unexpectedly commented on the defendant's silence. The comment on silence was simply not responsive to the question. It bears no logical relationship to the line of questioning, having been added spontaneously by the witness. Such testimony regarding silence is not "used" against a defendant because it is not logically linked up with any contention or inference that harms the defendant.

further attention to the problem by way of a curative instruction.[6]

More troublesome is the prosecutor's closing argument. It is true that the prosecutor's closing did not refer directly to the defendant's post-Miranda silence. The prosecutor referred only to the actual statements that Waite made in response to Sergeant Fournier's questioning.[7] Thus, the proscription of *Doyle* with respect to a defendant's *silence* does not preclude prosecutorial comment on express post-Miranda statements; the warning is that "any statement you make can be used against you."

The defendant's objection to the closing argument does

[6]On its face Waite's brief claims violations of the Fifth, Sixth, and Fourteenth Amendments to the Federal Constitution and art. 12 of the Massachusetts Declaration of Rights. The brief goes no further in developing the State constitutional arguments. See Mass. R. A. P. 16 (a) (4), as amended, 367 Mass. 921 (1975). Thus, we base our views on Federal law only.

[7]In a portion of the argument that Waite "knew what he was doing," the prosecutor stated:

"And we know from his own conduct afterwards that he knew what he was doing. What did he do with the gun? He tried to get rid of it. Why? Because he was trying to hide, trying to conceal it. He wanted to get it away from him. Some thought went into that. He didn't just say well, here's a fire hydrant, I'll throw it over there. He had an intent and a purpose which was to get rid of the gun.

"*When he got arrested by the police, he lied to the police.* [']I don't know anything about a gun. I've never been over at Fernbank Road. I've never been over by Eastfield Mall.['] He lied. *He deceived them intentionally, purposefully, from the moment when he tried to conceal his motive from [a relative] up until the point when he tried to conceal what he had done from the police.* It was a common plan, a purpose, intent, that he was involved in.

"Did he tell the police, yes, I shot him? No, I don't know what your're talking about. I don't have the gun. Never been there. And you heard the testimony of Officer Fournier. He placed the defendant under arrest. The defendant was in his custody for a period of time. He had no trouble understanding him. He had no trouble with the way he walked, the way that he talked. He was not confused. He was not in a daze. Evidence that he was not impaired and evidence that at the same time he was thinking because he was trying to deceive."

point us toward error in the prosecutor's comments. By long-standing rule a defendant's postcharge denials cannot be used at all, except as prior inconsistent statements should the defendant testify at trial. *Commonwealth* v. *Cantor*, 253 Mass. 509, 512-513 (1925) (defendant's request to know charges and subsequent denial). See *Commonwealth* v. *Trefethen*, 157 Mass. 180, 196-199 (1892) (defendant's response, to accusation, that he had not seen the victim). See also *Commonwealth* v. *Nawn*, 394 Mass. 1, 4-5 (1985) (neither prosecutor nor defendant can use post-Miranda denials). Sergeant Fournier's testimony regarding the interrogation of Waite, and the portion of the closing argument that remarked on that testimony, fall within this proscription. Waite asked why he was being arrested, and after receiving warnings he denied any knowledge of the crime. Defendants are, of course, under absolutely no obligation to disprove government accusations, and the Commonwealth instinctively concedes that these comments in closing argument would have been better left unsaid. Also, we are troubled by the prosecutor's bald assertion to the jury that the defendant was "a liar." To argue to the jury in this manner was clear error.[8]

The Commonwealth's primary argument on appeal is that the prosecutor's description of the defendant as "a liar" and of the defendant's failure to give honest answers when he was arrested was harmless error. See *Commonwealth* v. *Mahdi*, 388 Mass. 679, 696-697 (1983). An error of constitutional dimension, see *Nawn*, *supra* at 5, can indeed be harmless, if the government so demonstrates beyond a reasonable doubt.[9] See, e.g., *Brecht* v. *Abrahamson*, 507 U.S. 619, 629 (1993). Improper use of a defendant's denials of knowledge of the

---

[8]The prosecution is correct in pointing out some problems with the defendant's veracity. This is not one of those cases. The defendant never took the stand. See *Commonwealth* v. *Person*, 400 Mass. 136, 140 (1987).

[9]In *Commonwealth* v. *Mahdi*, 388 Mass. 679, 696-697 (1983), we set out some guideposts for determining constitutional error is harmless beyond a reasonable doubt. We stated: "In determining whether or not an error is harmless by weighing the prejudicial effect of the improper evidence, there are several factors which this court and others have considered: (1) the relationship between the evidence and the premise of the defense; (2) who introduced the issue at trial; (3) the weight or quantum of evidence of guilt; (4) the frequency of the reference; and (5) the availability or effect of curative instructions. These factors are not exclusive or exhaustive. Neverthe-

crime or of guilt might therefore be harmless when the jury considers other evidence, such as prearrest or pre-Miranda silence. See *id*. at 638-639. In Waite's case there was cumulative and diverse evidence of the defendant's mental state before, during, and after the killings as well as after arrest.

The jury convicted Waite of murder in the first degree on a theory of deliberate and premeditated murder. The prosecution presented overwhelming evidence to demonstrate such, and argued that evidence to the jury. The remark about post-Miranda denials was only a brief detour from the broad path of premeditation evidence relating to events before and during the killings. On the day of the killings Waite told a relative that he "had something" for one of the victims. He secretively took the murder weapon from his sister's bedroom. He went to his former wife's place of work, asked for her, and then waited for her. See *Commonwealth* v. *Phoenix*, 409 Mass. 408, 431 (1991). He followed her in his Jeep, forced the victims' car from the road, and fired multiple point-blank shots from a lever-action rifle, see *Commonwealth* v. *Cohen*, 412 Mass. 375, 378-379 (1992); *Commonwealth* v. *Good*, 409 Mass. 612, 618 (1991); *Commonwealth* v. *Skinner*, 408 Mass. 88, 90-92, 94 n.3 (1990) (cocking of weapon at both victims indicative of premeditation). After the first shot that injured one of the victims, Waite followed that victim and fired again, at close range at the victim's head. See *id*. Various witnesses described him as sober and calm throughout. Post-Miranda statements that offered only an attenuated inference of premeditation did not add much in light of a mountain of more direct evidence. On review of the entire record, we believe the error in the prosecutor's argument to be harmless beyond a reasonable doubt.

2. *Limits on expert testimony*. Waite called a psychologist as an expert witness at trial to bolster his claim of mental impairment. Dr. Kucharski, a staff forensic psychologist at Bridgewater State Hospital (Bridgewater), had interviewed

---

less, this scoreboard method to distinguish harmless from harmful error is useful." (Footnotes and citations omitted.)

Although there was no specific curative instructions requested, the judge charged the jury: "Now, what is not evidence? Everything that went on during the trial was not evidence. The opening arguments . . . were not evidence . . . and the closing arguments that you have heard here this morning are not evidence. Closing arguments are attempts by the lawyers to remind you of evidence that was favorable to their particular side of the case."

the defendant five weeks after the killings. In preparation for trial this expert reviewed the psychological, medical, and police records in the case. The judge ruled that Dr. Kucharski could not make any mention of an earlier diagnosis tentatively made by a psychiatrist at Bridgewater and rendered shortly after Waite's arrest. The judge's reasoning was that a preliminary diagnosis, which was never developed by the psychiatrist to the point of final diagnosis, was not sufficiently reliable for Dr. Kucharski to refer to it. Waite assigns error, asserting that the psychiatrist's preliminary diagnosis was admissible for at least the limited purpose of showing the basis of the trial expert's testimony. See *Simon* v. *Solomon*, 385 Mass. 91, 105 (1982) (testimony as to basis of opinion "of great use" to jury in evaluating expert testimony). See also *Care & Protection of Rebecca*, 419 Mass. 67, 83 (1994) (discussing admission for limited purpose); *Nancy P.* v. *D'Amato*, 401 Mass. 516, 524 (1988) (same).

When an expert provides the jury with an opinion regarding the facts of the case, that opinion must rest on a proper basis, else inadmissible evidence might enter in the guise of expert opinion. The expert must have knowledge of the particular facts from firsthand observation, or from a proper hypothetical question posed by counsel, or from unadmitted evidence that would nevertheless be admissible. See *Commonwealth* v. *Roman*, 414 Mass. 235, 238 (1993); *Department of Youth Servs.* v. *A Juvenile*, 398 Mass. 516, 538 (1986). See generally P.J. Liacos, Massachusetts Evidence §§ 7.10.2-7.10.3 (6th ed. 1994 & Supp. 1995). In the case of expert medical testimony, medical records regarding treatment and history are admissible hearsay, and such records can form the basis of expert opinion. See G. L. c. 233, § 79 (1994 ed.). Cf. *Commonwealth* v. *Daye*, 411 Mass. 719, 742-743 (1992) (opinion based on forensic laboratory work actually conducted by technician not testifying). Simple clinical observations and laboratory test results ordinarily fall within this rule, *Diaz* v. *Eli Lilly & Co.*, 14 Mass. App. Ct. 448, 452 n.9 (1982), and cases cited, and diagnoses recorded in a patient's medical chart sometimes do as well. Quite often, however, a diagnosis that is controversial or involves difficulties in interpretation does not have the same reliability. See *Commonwealth* v. *Dube*, 413 Mass. 570, 574-575 n.5 (1992) (approving of *Diaz*, *supra*). See also *Commonwealth* v. *McDonough*, 400 Mass.

639, 646 (1987). A trial judge may preclude the use of such hearsay diagnoses. See *Diaz, supra* at 452-455. Cf. *Grant* v. *Lewis/Boyle, Inc.*, 408 Mass. 269, 273 (1990). Whatever the bounds of a judge's discretion in such matters, see *Commonwealth* v. *Colin C.*, 419 Mass. 54, 59 (1994) (broad discretion to admit expert testimony); *Anthony's Pier Four, Inc.* v. *HBC Assocs.*, 411 Mass. 451, 481-482 (1991) (discretion to exclude expert testimony), in this case the expert himself revealed that the staff at Bridgewater considered any preliminary diagnosis as only an "initial impression" and not a "definitive diagnosis." Thus the hearsay diagnosis was, even to the expert who was to rely on it, in need of some further indicia of reliability. The judge did not abuse his discretion in deeming the preliminary diagnosis not an acceptable basis for the expert's opinion.

3. *Claims of instructional error.*

a. *Definition of malice aforethought.* Waite assigns error to several portions of the charge regarding malice, alleging that the judge misdescribed that element of murder. The defendant's arguments generally refer to out of context individual sentences and do not address the charge as a whole. We, of course, evaluate the charge as a whole, looking for what meaning a reasonable juror could put to the words of the trial judge. E.g., *Commonwealth* v. *Rosa, ante* 18, 27 & n.10 (1996); *Commonwealth* v. *Torres*, 420 Mass. 479, 490 n.10 (1995).

It is true that the defendant's claims of error in regard to the judge's definition of the third prong of malice, as given in the main charge and repeated in a supplemental response to jury questions, have some validity, see *Commonwealth* v. *Burke*, 414 Mass. 252, 265-266 (1993); *Commonwealth* v. *Sires*, 413 Mass. 292, 295-298 (1992). However, we need not parse carefully whether this aspect of the charge contained reversible error. A misdescription of the law will be viewed as harmless when the government can show that the mistake played no role in the jury verdict. In view of the specific jury finding of guilty on the ground of premeditated murder, we need focus only on the judge's correct charge as to malice and premeditation. Premeditation, as defined by the judge in this case, has as a necessary condition of guilt the specific intent to kill. See *Commonwealth* v. *Parker*, 420 Mass. 242, 245 n.3 (1995); *Commonwealth* v. *Henson*, 394 Mass. 584, 592-593 (1985). The jury having returned verdicts of murder

in the first degree on the premeditation theory, there can be no doubt that the jury in fact found that Waite had a specific intent to kill both his estranged wife and her boy friend. Put otherwise, the jury found malice aforethought on the first prong of malice, which is met by proof of a specific intent to kill. See *Torres, supra* at 488. The jury verdicts did not result from any erroneous third-prong instruction. *Commonwealth v. Judge,* 420 Mass. 433, 441-442 (1995). See *Commonwealth v. Vazquez,* 419 Mass. 350, 355 (1995). Thus, there is no reversible error under this claim.

b. *Intoxication and mental impairment instructions.* Waite asserts that the judge's charge as to voluntary intoxication and mental impairment included "finding" language contrary to the teaching of *Connolly v. Commonwealth,* 377 Mass. 527, 532-538 (1979).[10] Such language could lead reasonable jurors to think that they must make some preliminary finding before turning to the penultimate step in the inquiry, thereby creating too great a risk that jurors will evaluate the evidence with a burden on the defendant. *Commonwealth v. Richards,* 384 Mass. 396, 405 (1981). We have noted this problem when "finding" language is used in connection with complete, malice-negating defenses. See *Commonwealth v. Lapointe,* 402 Mass. 321, 328 (1988) (self-defense); *Commonwealth v. Zezima,* 387 Mass. 748, 756-757 (1982) (accident); *Commonwealth v. Thurber,* 383 Mass. 328, 331-332 (1981) (necessity). Compare *Commonwealth v. Medina,* 380 Mass. 565, 578-579 (1980) (no error in using "finding" language with respect to elements of offense).

In *Commonwealth v. Costello,* 392 Mass. 393, 405 (1984), we noted that intoxication and impairment do not negate premeditation, but are mere subsidiary facts that the jury consider in sifting the circumstantial evidence as to his mental state. See *Commonwealth v. Vazquez, supra* at 353; *Commonwealth v. Shea,* 401 Mass. 731, 742-743 (1988). Consideration of such subsidiary facts is "part of the subtle weighing process performed by the jury alone," *Costello, supra,* and it is unnecessary to instruct as to the burden and standard of proof on each inferential or intermediate step the jury must

[10]The complained-of statements took the general form: "If you find [or are satisfied] that the defendant was impaired or intoxicated, you should consider that evidence in deciding whether the Commonwealth has demonstrated the requisite mental state."

take in deciding whether an element of the offense is proved by the Commonwealth beyond a reasonable doubt. See, e.g., *Commonwealth* v. *Cook*, 419 Mass. 192, 204 (1994) (evidence plus reasonable inferences must result in proof beyond a reasonable doubt). With no requirement that the jury find these subsidiary facts and inferences beyond a reasonable doubt, see *Commonwealth* v. *Lombard*, 419 Mass. 585, 589 (1994), there is no particular standard of proof that "finding" language can impermissibly alter. We agree that the judge repeatedly and inappropriately used disfavored "finding" language when he was instructing the jury regarding mental impairment and intoxication *as factors that could be considered* in determining the issue of specific intent. We emphasize again that "finding" language is best left unused, for the subtle weighing should be left to the jury once a judge has stated that they may consider intoxication and impairment evidence, see *Commonwealth* v. *Longo*, 402 Mass. 482, 487 (1988). Here, however, there was no reversible error, for the charge as a whole repeatedly and clearly emphasized the Commonwealth's burden of proof beyond a reasonable doubt on every element of murder.

c. *Lack of capacity instruction.* The judge also should not have used the "if you find" and "if you are satisfied" prefaces throughout his instructions regarding the insanity defense. Lack of capacity is a complete element-negating defense. Therefore, the principles stated in *Connolly* v. *Commonwealth, supra,* apply. *Commonwealth* v. *Adorno,* 407 Mass. 428, 430 (1990). Nevertheless, considering the charge as a whole the judge (unlike in *Connolly*) reiterated the standard of beyond a reasonable doubt in very close proximity to the suspect usage. *Lapointe, supra* at 328. *Commonwealth* v. *Albert,* 391 Mass. 853, 859 (1984). The insanity instruction was also the last substantive portion of the charge. It was followed immediately by instructions where the judge reemphasized the high standard of proof placed on the Commonwealth and by reemphasizing that the presumption of innocence was in favor of the defendant. See *Adorno, supra* at 430-432 (insanity-defense instruction flanked at either end by correct standard of proof instruction not error). At several points in the insanity instruction the judge used these concepts in the same sentence, stating "if you find to a point beyond a reasonable doubt." Compare *id.* at 431; *Shea, supra* at 742 n.7. A reasonable juror could not have inferred from these instances of "finding

language" that the defendant "was required to wield the laboring oar." *Connolly, supra* at 534.[11]

4. *Ineffective assistance of trial counsel.* Appellate counsel essentially reargues every prior allegation of error in the guise of claims of ineffective assistance of trial counsel. We have noted that, if an error not objected to by trial counsel does not create a substantial likelihood of a miscarriage of justice, see G. L. c. 278, § 33E (1994 ed.), a claim of ineffective assistance of counsel with respect to such error will not succeed. *Commonwealth* v. *Wright*, 411 Mass. 678, 681-682 (1992). Most of the ineffective assistance claims here are duplicative and, thus, do not succeed. See *Commonwealth* v. *Cohen*, 412 Mass. 375, 389-390 (1992).

Many ineffective assistance claims have a prerequisite showing, e.g., no tactical reason for the action or inaction of counsel, *Commonwealth* v. *Parker*, 420 Mass. 242, 248 n.7 (1995), that demands factfinding. Cf. Mass. R. Crim. P. 30 (c), as appearing in 420 Mass. 1502 (1995). Other such claims look outside the trial record, asserting that counsel did not properly prepare for trial or did not call particular witnesses. A motion for a new trial may be filed in this court after the appeal has been entered. G. L. c. 278, § 33E. We generally remand such motions to the trial judge, who is better equipped to conduct any necessary evidentiary hearings and also had witnessed trial counsel's performance firsthand. See Mass. R. A. P. 15 (d), as amended, 378 Mass. 939 (1979). To the extent that Waite's claims of ineffective assistance are not duplicative of issues already substantively addressed, the rest are not properly before us. See *Commonwealth* v. *Williams*, 378 Mass. 217, 238 (1979).

---

[11]Waite also asserts error in the supplemental charge that responded to jury questions. The jury sent a note stating, "We need more clarity for the difference between first and second degree murder. Also need more clarity on the difference between first degree and second degree premeditation." The judge completely restated the definition of murder and its degrees. Waite believes that in light of the complete restatement, the judge should have restated the impairment and incapacity instructions as well. The proper response to a jury question must remain within the discretion of the trial judge, who has observed the evidence and the jury firsthand and can tailor supplemental instructions accordingly. A jury that has engaged in some deliberations generally have focused their inquiry, and it serves the interests of justice for any supplemental instruction to help hone that inquiry, furthering the difficult task of coming to a unanimous verdict. There was no abuse of the judge's broad discretion here.

5. *Summary.* Our review of the assigned errors and the entire record gives us no reason to use our extraordinary power, G. L. c. 278, § 33E, to overturn or reduce the verdicts. There was no error mandating reversal, and the judgments of the Superior Court, including two judgments of conviction for murder in the first degree are affirmed.

*So ordered.*