## COMMONWEALTH *vs.* JOSE M. MERCADO.

Plymouth. November 6, 2009. - March 3, 2010.

Present: MARSHALL, C.J., COWIN, CORDY, BOTSFORD, & GANTS, JJ.

*Homicide. Constitutional Law,* Confrontation of witnesses. *Witness,* Cross-examination. *Mental Impairment. Self-Defense. Practice, Criminal,* Capital case, Confrontation of witnesses, Instructions to jury, Conduct of prosecutor. *Evidence,* Cross-examination, Expert opinion.

At the trial of an indictment charging the defendant with murder in the first degree on a theory of deliberate premeditation, the judge's limitation on the use of autopsy photographs during the defendant's cross-examination of a Commonwealth witness did not violate the defendant's constitutional right to confront his accusers, where the witness's testimony on direct examination was not material to the question of premeditation, and where the defendant did not meet his burden of demonstrating that the limitation hampered his over-all trial strategy or his cross-examination of that witness. [202-204]

At the trial of an indictment charging the defendant with murder in the first degree on a theory of deliberate premeditation, the judge's instructions provided the jury with adequate guidance on how to evaluate the evidence of mental impairment as it pertained to premeditation, and the judge was not required to repeat portions of the general instructions on the weighing of evidence when instructing on mental impairment. [204-208]

At a murder trial, no substantial likelihood of a miscarriage of justice arose from the judge's not instructing on self-defense, where the defendant was not entitled to such an instruction, in that there was no evidence to support a claim that the defendant acted in actual and reasonable fear that he was in imminent danger of death or serious bodily harm, from which he could save himself only by using deadly force, nor was there evidence that the defendant availed himself of any means to retreat from the conflict before resorting to the use of deadly force. [208-210]

At a criminal trial, no substantial likelihood of a miscarriage of justice arose from the judge's denial of the defendant's request, made after the jury had been charged, for a curative instruction regarding the prosecutor's alleged nonverbal conduct. [210]

This court, conducting review under G. L. c. 278, § 33E, concluded that at the trial of an indictment charging murder in the first degree on a theory of deliberate premeditation, a medical examiner's testimony regarding the victim's autopsy, which was conducted by another medical examiner, although violative in certain respects of the defendant's right of confrontation guaranteed by the Sixth Amendment to the United States Constitution and art. 12 of the Massachusetts Declaration of Rights, did not result in a substantial likelihood of a miscarriage of justice, where neither the cause

of death nor any other aspect of the autopsy report was a central issue at
trial; having reviewed all other aspects of the record, this court declined to
exercise its power to reduce the conviction to a lesser degree of guilt or to
order a new trial. [210-212]

INDICTMENTS found and returned in the Superior Court Depart-
ment on October 25, 2002.

The cases were tried before *Linda E. Giles*, J.

*Stephen Neyman* for the defendant.

*Robert C. Thompson*, Assistant District Attorney, for the
Commonwealth.

MARSHALL, C.J. A Superior Court jury convicted the defendant
of murder in the first degree on a theory of deliberate premed-
itation.[1] On appeal he advances four arguments: (1) the trial
judge impermissibly restricted his right to cross-examine a Com-
monwealth witness; (2) the judge's instruction on mental impair-
ment did not provide adequate guidance to the jury on how to
evaluate the evidence of mental impairment as it pertained to
premeditation; (3) the judge erroneously failed to give a jury
instruction on self-defense; and (4) the prosecutor's "smirking"
at the defendant's family during the Commonwealth's summation
created a substantial likelihood of a miscarriage of justice. The
defendant requests that we reverse the murder conviction and
grant him a new trial or reduce the verdict. G. L. c. 278, § 33E.
For the reasons set out below, we affirm the conviction of murder
in the first degree and discern no basis to exercise our powers
under that statute.

1. *Facts.* We summarize the evidence as the jury could have
found it, reserving certain facts for later discussion. In the late
afternoon of June 21, 2002, the defendant was socializing with
friends in the parking lot of a liquor store on Pleasant Street in
Brockton. Many people, including children, were in the immedi-
ate vicinity. Nelly Corea had set up a chair in the store's parking
lot to braid hair for money.

---

[1]The defendant makes no argument concerning his conviction of the unlaw-
ful possession of a firearm in violation of G. L. c. 269, § 10 (*a*). We do not
consider the effect, if any, of *District of Columbia* v. *Heller*, 128 S. Ct. 2783
(2008), on the firearm conviction. See *National Rifle Ass'n* v. *Chicago*, 567
F.3d 856, 857 (7th Cir.), cert. granted, 130 S. Ct. 48 (2009) (whether Second
Amendment to United States Constitution applies to States).

At approximately 5:30 P.M. the victim drove a gray Jeep Cherokee automobile into the liquor store parking lot. On leaving his vehicle, he and the defendant resumed a running argument about another automobile that the defendant had purchased from the victim and his girl friend the previous month for $400. The defendant had paid $200 when he took possession of the vehicle, and the parties had agreed that the defendant would pay the remaining $200 within two weeks. The defendant never made the second payment. After the vehicle broke down a second time, the defendant abandoned it at a rest stop on Route 24. The two men had had several arguments about the matter before their encounter in the liquor store parking lot.[2]

Witnesses to the events of June 21 testified that the argument between the defendant and victim became heated. Corea, the hair stylist, testified that the two men were "chest butting." Jose Davila testified that the victim was a large, muscular man known to be "[v]ery aggressive," and that, during the argument, the victim called the defendant a "cabron,"[3] and otherwise showed him "no respect." Davila testified that the defendant began "losing control" and threatened the victim that "he would have to go back to Puerto Rico in a box"[4] if he did not leave the area. The defendant also told the victim that "he was going to pay him, he just wasn't going to pay him that day" for the automobile.

The defendant then left the scene for some amount of time, which is disputed, but no more than fifteen minutes. See part 2, infra. The defendant later confessed to leaving the scene of the argument, walking from the parking lot to the corner of Warren Avenue and Pleasant Street, stopping at the intersection feeling "mad and in fear for his family," and then returning to the parking lot.[5]

---

[2]Several days after the automobile broke down on Route 24, the victim visited the defendant's apartment. Although the defendant was not home, the victim told the defendant's girl friend that he was looking for his $200. The defendant had also heard "on the street" that the victim had threatened to harm him and his family.

[3]The Spanish word "cabron" means a male goat, but the word may also be used as an insult. See Diccionario Moderno Español-Inglés 155 (Larousse ed. 1976).

[4]The defendant is and the victim was from Puerto Rico.

[5]Nelly Corea testified that she saw the defendant leave from and return to

During the defendant's absence, the victim had seated himself in Corea's chair to have his hair braided. Several people who had witnessed his argument with the defendant urged the victim to leave the scene, but the victim responded loudly that he was waiting for the defendant to return. While Corea was braiding the victim's hair, the defendant returned to the parking lot wielding a gun. According to Davila, "Everyone was screaming." The defendant came within approximately five feet of the seated victim and shot him once, fatally, in the chest.[6]

After the shooting, the defendant fled to Medina, New York, where the police eventually located him. On July 18, 2002, aided by New York State police, two detectives from the Brockton police department and two Massachusetts State troopers arrested the defendant at his father's house in Medina. After receiving Miranda warnings, the defendant agreed to speak with the officers. At first he denied all involvement in the shooting, but soon confessed.[7] He told the officers that he had feared that the victim would harm his family, and that he should have turned himself in to the police. One trooper testified that when the defendant was asked why he would shoot someone in broad daylight in front of so many witnesses, he replied that the victim "got him so mad that he didn't care that people were around."

The defendant was taken to the State police barracks in Albion, New York. Several hours later, his father and stepmother arrived at the police station and, in the presence of a New York State police investigator, the defendant described to them what had happened.[8] The defendant described the dispute with the

the liquor store parking lot on a bicycle. Jose Davila testified that the defendant ran back to the parking lot. These inconsistencies are not relevant to our conclusions.

[6]The bullet penetrated the victim's left forearm and entered his chest, breaking a rib and going through his heart, diaphragm, and liver, and then lodging in his large intestine. The victim bled to death as a result of the gunshot wound.

[7]The defendant's confession was not tape recorded. His confession was admitted through testimony of a State trooper. Before the jury heard this testimony and in her final jury instructions, the judge instructed that the Commonwealth had the burden of proving the voluntariness of the defendant's confession, and that the fact that the confession had not been tape recorded permitted, but did not compel, an inference that the confession was not voluntary. See *Commonwealth* v. *DiGiambattista*, 442 Mass. 423, 447-448 (2004).

[8]The New York State police investigator testified that he explained to the

victim over the purchase of the vehicle, and stated, as the trooper testified, that "[t]he guy sat down to get his hair braided and that he went to the victim's car, retrieved the gun, came back and shot him one time in the chest with his own gun."

The defendant did not testify. His only witness was a forensic psychologist whose expert testimony we describe *infra*. We turn now to the merits.

2. *Limit on cross-examination.* The defendant argues that his right under the Sixth Amendment to the United States Constitution and art. 12 of the Massachusetts Declaration of Rights to confront his accusers[9] was violated when the judge impermissibly restricted his cross-examination of Corea. See *Commonwealth* v. *Mattei*, 455 Mass. 840, 857-860 (2010); *Commonwealth* v. *Miles*, 420 Mass. 67, 71 (1995) ("Both the Sixth Amendment and art. 12 guarantee a criminal defendant's right to confront the witnesses against him through cross-examination"). The judge's ruling, which we conclude was proper, occurred in the following circumstances.

On direct examination Corea, testifying for the Commonwealth, stated that ten to fifteen minutes passed from the time the defendant left the scene to the time he returned with the gun, a point helpful to the Commonwealth's theory of premeditation. See *Commonwealth* v. *Nolin*, 448 Mass. 207, 216 n.7 (2007) (although no particular length of time is required to prove deliberate premeditation, prosecution must show that plan to kill was formed after deliberation and reflection). Corea's estimate was based on her experience as a hair stylist: she testified that a single braid down the middle of a person's head — the longest braid — took between five and ten minutes to complete, and that she had completed two side braids for the victim and had begun a third braid when the defendant reappeared.

On cross-examination defense counsel sought to undercut

defendant, his father, and his stepmother that he would be in the room while the defendant was speaking to them.

[9]The Sixth Amendment to the United States Constitution provides, in part, that an accused has the right "to be confronted with the witnesses against him." Article 12 of the Massachusetts Declaration of Rights provides, in part, that "every subject shall have a right to produce all proofs, that may be favorable to him; to meet the witnesses against him face to face, and to be fully heard in his defense by himself, or his counsel, at his election."

Corea's testimony by establishing that, in the time between the defendant's leaving the parking lot and his return, Corea had done substantially less braiding of the victim's hair and the defendant could not have been away for as long as Corea had estimated. In pursuing this line of questions, defense counsel introduced autopsy photographs purporting to show that the only braids that Corea had completed for the victim were small ones on one side of his head. Looking at the first autopsy photograph, Corea testified that she did not see evidence of any braiding she had done for the victim. She testified that the photograph of the victim in a second autopsy photograph did not "look like him." When defense counsel attempted to show Corea a third autopsy photograph, the prosecutor objected. At sidebar, the judge ruled that no further autopsy photographs were to be shown to Corea because they were immaterial, "upsetting" to the witness, and not a fair representation of the deceased's hairstyle.[10]

A trial judge has broad discretion to limit cross-examination of a witness. *Commonwealth* v. *Jordan*, 439 Mass. 47, 55 (2003). In determining whether the limitation is impermissible, "we weigh the materiality of the witness's direct testimony and the degree of the restriction on cross-examination." *Commonwealth* v. *Vardinski*, 438 Mass. 444, 451 (2003), quoting *Commonwealth* v. *Miles*, *supra* at 72. Limiting counsel's use of "inflammatory" photographs on cross-examination may be particularly proper when disturbing visual evidence has minimal probative value. See *Commonwealth* v. *DeSouza*, 428 Mass. 667, 670 (1999) ("The question whether the inflammatory quality of a photograph outweighs its probative value and precludes its admission is determined in the sound discretion of the trial judge").

Whether the defendant was absent for two, five, or ten minutes is immaterial. See *Commonwealth* v. *Coleman*, 434 Mass. 165, 168 (2001) (sufficient evidence of premeditation where after fistfight, defendant walked to nearby automobile, retrieved gun from trunk, turned and shot victim). Two eyewitnesses testified

---

[10]At sidebar the judge stated, "Question her about how long it took her to braid. . . . These [photographs] are not representing his head. They are autopsy pictures, not from a hair dressing school, showing his body, where he got shot. Those aren't a fair representation of a hairstyle. So do not use the autopsy pictures."

and the defendant stated in his confession that the defendant argued heatedly with the victim in the liquor store parking lot, left the scene, obtained a gun, then returned and shot the victim. "[A] plan to murder may be formed in seconds." *Id.*

Nor has the defendant met his burden of demonstrating that the judge's order limiting use of the autopsy photographs hampered the defendant's over-all trial strategy or his cross-examination of Corea. See *Commonwealth* v. *Avalos*, 454 Mass. 1, 7 (2009) (party challenging limitation on cross-examination bears burden of proving abuse of discretion). By thorough cross-examination of Corea, defense counsel impeached her direct testimony of the time the defendant was away from the parking lot.[11] Casting doubt on Corea's original estimate of the duration of the defendant's absence was precisely what defense counsel set out to do, and did effectively. See *id.* at 8, quoting *Commonwealth* v. *LaVelle*, 414 Mass. 146, 154 (1993) (no abuse of discretion in limiting cross-examination where matter was "sufficiently aired" at trial by other means). Cf. *Davis* v. *Alaska*, 415 U.S. 308, 318 (1974) (judge's refusal to allow defendant to cross-examine witness denied defendant ability to present theory of possible bias of witness).

We see no merit in the defendant's further claim that the judge's limitation on the use of autopsy photographs deprived him of "hard evidence" to disprove Corea's testimony. The autopsy photographs bore no material relationship to Corea's testimony. Corea testified that the photographs did not accurately represent the victim or the braiding that she had completed for him. The judge in turn noted, and we agree, that the autopsy photographs "do not show his head very well" and were not a "fair representation" of the victim's hairstyle. In any event, several autopsy photographs, including the two shown to Corea, were entered in evidence, allowing the jury to assess for themselves the relevance of the photographs to the issues in the case.[12,13]

3. *Mental impairment jury instruction.* The defendant contends

---

[11]On cross-examination, defense counsel asked, "Well, if it takes five minutes to do the whole [braid], it must not take ten minutes to do a little braiding on the side, does it?" Corea responded, "Yes, that's true."

[12]On appeal, the defendant suggests that the cross-examination limited by the judge would have "likely establish[ed] the basis for a self-defense instruction." At trial his sole objection to the judge's order was that a more

that the judge's instruction on mental impairment created a substantial likelihood of a miscarriage of justice because the instruction failed to provide the jury with adequate guidance on how to evaluate the testimony of his expert psychologist as it pertained to premeditation.[14] There was no error.

A key point of the defense was that the defendant suffered from a mental illness and lacked the ability to form the requisite state of mind to sustain a conviction of murder based on pre-meditation. We summarize the evidence concerning the defendant's mental state at the time of the killing. Dr. Ronald Ebert, a forensic psychologist, testified that, in his pretrial meetings with the defendant, he learned that the defendant had been hearing voices, had attempted suicide on two prior occasions, had experienced visual hallucinations, and had abused alcohol and marijuana. Dr. Ebert also testified that the defendant had sought treatment at a mental health facility on two occasions just prior to the shooting.[15] In Dr. Ebert's expert opinion, at the time of the shooting the defendant was suffering from a major depression with psychotic features, substance dependence, and an antisocial personality disorder. Dr. Ebert opined that the defendant's mental illness impaired his ability to form the specific intent for murder with premeditation.

complete cross-examination was needed to impeach the testimony of Corea as to the time it took to braid the victim's hair, presumably to refute a theory of deliberate premeditation. His self-defense argument was not presented to the judge and is waived; we consider the point only in connection with our review under G. L. c. 278, § 33E. See *Commonwealth* v. *Viriyahiranpaiboon*, 412 Mass. 224, 230 (1992) (defendant waives right to appeal on grounds not raised before judge; in such circumstances, test is whether there was error that created substantial likelihood of miscarriage of justice). The defendant was not entitled to a self-defense instruction, as explained *infra*. The autopsy photographs the defendant sought to introduce on cross-examination do not form a basis for a self-defense instruction.

[13]In light of our conclusion, we need not reach the Commonwealth's argument that, because the photographs had not been properly authenticated, there was no error in limiting their use.

[14]Because the defendant failed to object to this aspect of the jury instructions, our review is limited to whether the instruction was erroneous and, if so, whether it created a substantial likelihood of a miscarriage of justice. *Commonwealth* v. *Nardi*, 452 Mass. 379, 395 (2008).

[15]The defendant's medical records indicated that he had voluntarily sought treatment at the South Bay Mental Health Center on June 7 and June 18, 2002, because he reported hearing voices, paranoia, anxiety, hallucinations, and feelings of worthlessness.

The Commonwealth rebutted Dr. Ebert's testimony with the expert testimony of Dr. Russell Vasile, a forensic psychiatrist, who testified that he did not find sufficient evidence of major depression with psychotic features. According to Dr. Vasile, at the time of the shooting the defendant was in emotional turmoil, but no major mental illness impaired the defendant's capacity to form the requisite specific intent.

At the beginning of her charge, the judge instructed the jury generally on inferences and circumstantial evidence, instructions that the defendant does not challenge. The judge later instructed the jury on mental impairment, following verbatim the model jury instructions.[16] See Model Jury Instructions on Homicide 61 (1999). Nevertheless, the defendant contends that, when the judge told the jury that they "may" or "should consider any credible evidence of mental impairment," her words gave "no guidance" to the jurors on how to evaluate the evidence of mental impairment as it pertained to premeditation; that the judge at this point in her instruction should have reinstructed the jury on inferences and circumstantial evidence; and that the instructions as given were consequently inadequate.

---

[16]The judge instructed the jury, in relevant part:

"Whenever the Commonwealth must prove the defendant's intention to do something, you should consider any credible evidence of mental impairment in determining whether the Commonwealth has met its burden of proof. Likewise, whenever the Commonwealth must prove the defendant's knowledge of any facts or circumstances, you should consider any credible evidence of mental impairment in determining whether the Commonwealth has met its burden of proof.

"More particularly, you may consider any credible evidence of the defendant's mental impairment in determining whether the defendant deliberately premeditated the killing of the deceased, that is, whether the defendant thought before he acted and whether the defendant reached the decision to kill after reflection at least for a short period of time, or whether the defendant intended to kill, or cause grievous bodily harm, or was aware that his conduct created a plain and strong likelihood that death would result.

"I reiterate, whenever the Commonwealth must prove that the defendant intended to do something, or had knowledge of certain facts or circumstances, in order to prove the crime, you may consider any credible evidence of mental impairment in determining whether the Commonwealth has met its burden of proving the defendant's intent or knowledge."

In *Commonwealth* v. *Waite*, 422 Mass. 792, 805 (1996) (*Waite*), this court concluded that the jury need not make a specific finding of mental impairment in order to negate premeditation. Instead, evidence of intoxication or impairment "are mere subsidiary facts that the jury consider in sifting the circumstantial evidence as to [the defendant's] mental state." *Id.* Consideration of such subsidiary facts is "part of the subtle weighing process performed by the jury alone." *Id.*, quoting *Commonwealth* v. *Costello*, 392 Mass. 393, 405 (1984). Pointing to this language in *Waite*, the defendant argues that the judge should have instructed the jury that a "person's knowledge or intent is a matter of fact, which is often not susceptible of proof by direct evidence, so resort is frequently made to proof by inference from all the facts and circumstances developed at the trial," *Commonwealth* v. *Casale*, 381 Mass. 167, 173 (1980),[17] and that, where "conflicting inferences are possible from the evidence, 'it is for the jury to determine where the truth lies.' " *Commonwealth* v. *Wilborne*, 382 Mass. 241, 245 (1981), quoting *Commonwealth* v. *Amazeen*, 375 Mass. 73, 81 (1978).[18] These statements, on which the defendant relies, reiterate well-established law that is consistent with the judge's general instructions. The defendant has pointed to no precedent, and we are aware of none, where a judge was required to repeat portions of the general instructions on the weighing of evidence when instructing on mental impairment. "All that we have ever required" be said to juries about the effect of mental impairment on a defendant's intent or knowledge is "satisfied by a simple instruction that the jury may consider credible evidence" of the mental impairment "in deciding whether the Commonwealth had met its burden of proving the defendant's state of mind beyond a reasonable doubt." *Commonwealth* v. *Sires*, 413 Mass. 292, 300 (1992) (concerning

---

[17]In *Commonwealth* v. *Casale*, 381 Mass. 167, 167 (1980), three defendants were indicted for murder in the first degree, and were convicted of murder in the second degree. Mental impairment was not an issue. Rather, the language in that case, relied on by the defendant here, relates to a portion of the opinion where this court considered whether the defendants had the requisite mental state to be found guilty of murder in the second degree. *Id.* at 173-174.

[18]The defendant relies on *Commonwealth* v. *Wilborne*, 382 Mass. 241, 245 (1981), which concerned a denial of a defendant's motion for a directed verdict in light of the deference due to the jury's reasonable findings.

consumption of drugs or alcohol, not mental impairment).[19] Such an instruction was given.

4. *Self-defense.* Although he did not object to the judge's instructions at trial, the defendant claims on appeal that the judge erred in failing to instruct the jury on self-defense.[20] In making this argument the defendant points to the following testimony of Dr. Ebert:[21]

> "[The defendant] said that the victim drove up in his car and threatened him. And he said again the victim asked for money. He asked for his money back. The victim threatened to kill him, called him names. . . . He says he was frightened. He says the victim showed him a gun that he had and then called him a curse word in Spanish, that he became frightened and angry, and was frightened for his family. And he tells me he saw the victim put the gun into the victim's car. He says he grabbed the gun, went back, and then tells me two different stories; one in which the victim and he had an argument and a fight and the gun goes off accidentally. Another one in which he tells me that he ran back and shot the victim without elaboration. . . .
>
> "He says to me in the first story that they scuffled, that the victim — at one point he says that the victim grabbed him by the shirt, that he punched him, that he punched the victim, so they got in some kind of altercation, by his report."

This evidence, the defendant argues, created the inference that the defendant was defending himself during a fight with the victim. The Commonwealth counters that the evidence of fear

[19]The model jury instruction for mental impairment is the same as the model jury instruction for intoxication. See Model Jury Instructions on Homicide 61 (1999).

[20]The defendant does not claim that his request for a self-defense instruction at the close of the Commonwealth's case-in-chief adequately preserved his objection to the judge's failure to give the self-defense instruction. See *Commonwealth* v. *Nunes*, 430 Mass. 1, 4 (1999) (because defendant did not object, assessing whether "instructions resulted in a substantial likelihood of a miscarriage of justice").

[21]This hearsay testimony was admitted without objection and therefore, as the judge noted at trial, was admitted in evidence for all purposes. See *Commonwealth* v. *Stewart*, 398 Mass. 535, 543 (1986).

by the defendant was insufficient to warrant an instruction on self-defense and that, in any event, evidence that the defendant failed to avail himself of an opportunity to retreat negated any conceivable claim of self-defense. We consider both points and conclude that the defendant was not entitled to the instruction.

In considering the defendant's fear, we assume that there was a physical altercation between the defendant and the victim, and that the defendant feared the victim, who previously had threatened to kill him and to harm his family. *Commonwealth* v. *Pike*, 428 Mass. 393, 395 (1998) ("no matter how incredible [the] testimony, that testimony must be treated as true" in considering entitlement to self-defense instruction). Even starting from that premise, the record does not support an inference that, on returning to the parking lot, the defendant acted in actual and reasonable fear that he was in "imminent danger of death or serious bodily harm, from which he could save himself only by using deadly force." *Commonwealth* v. *Harrington*, 379 Mass. 446, 450 (1980). There was no evidence that the victim was armed or that the defendant reasonably believed at the time that he was armed; to the contrary, the defendant testified that he took the victim's gun from the victim's car, suggesting that the defendant was armed and knew that the victim was not armed.

Second, the privilege to use self-defense arises only in circumstances in which the defendant uses all proper means to avoid physical combat. *Commonwealth* v. *Benoit*, 452 Mass. 212, 226 (2008). Here the record lacks any suggestion that the defendant availed himself of any means to retreat from the conflict before resorting to the use of deadly force. See *Commonwealth* v. *Avila*, 454 Mass. 744, 769 (2009), quoting *Commonwealth* v. *Pasteur*, 66 Mass. App. Ct. 812, 820 (2006) (where "there is no evidence that the principal was not able to walk away, there is no basis for a claim of self-defense"); *Commonwealth* v. *Pike*, *supra* at 399. The defendant was not detained at the scene against his will, and he was not compelled to return to the scene, much less to return with a loaded gun. The judge properly did not instruct the jury on self-defense. See *Commonwealth* v. *Diaz*, 453 Mass. 266, 280 (2009) (self-defense instruction not required where defendant "had access to an automobile; indeed, he entered the car to retrieve the weapon, but did not attempt to leave the scene"); *Commonwealth* v. *Hart*, 428 Mass. 614, 616 (1999)

(self-defense instruction not warranted where defendant had opportunity "to retreat and did so, but only to return a few minutes later armed with a loaded handgun").[22]

5. *Prosecutorial misconduct.* After the jury were charged, the defendant requested a curative instruction for what he claimed was the prosecutor's repetitive "smirks" at the defendant's family during the Commonwealth's closing argument; the request was denied. As the defendant recognizes, the request was untimely, and our review is limited to whether any failure of the judge to take action resulted in a substantial likelihood of a miscarriage of justice.

A prosecutor's nonverbal conduct may give rise to a claim of prejudice warranting the reversal of a verdict. Cf. *United States* v. *Collins,* 78 F.3d 1021, 1039 (6th Cir.), cert. denied, 519 U.S. 872 (1996) (laughter, gestures, and facial expressions by prosecutor may have been improper, but fell far short of reversible error). The judge made no finding that the prosecutor smirked or otherwise belittled the defendant or his family; rather, she dismissed the defendant's accusations as baseless. The judge was in the best position to see the prosecutor's demeanor during his closing argument, and there is no reason to disturb her conclusions.

6. *Review under G. L. c. 278, § 33E.* Although not raised by the defendant, we consider whether a medical examiner's testimony at trial regarding the victim's autopsy violated the defendant's rights of confrontation guaranteed by the Sixth Amendment and art. 12 because the autopsy had been undertaken by a different examiner. See *Commonwealth* v. *Nardi,* 452 Mass. 379, 387-396 (2008) (concerning testimony by medical examiner who did not perform autopsy); *Commonwealth* v. *Goudreau,* 422 Mass. 731, 732 (1996) (considering issues that defendant did not argue on appeal, but which require "our attention pursuant to our duty under G. L. c. 278, § 33E").

At trial, Dr. Mark Flomenbaum testified as to his opinion of the cause of death of the victim based on his review of the findings of an autopsy report conducted by Dr. James Weiner, as

---

[22]In light of our conclusion, we need not address the Commonwealth's argument that Dr. Ebert's testimony that the gun went off accidentally, giving rise to the accidental killing instruction, precludes giving an instruction on self-defense.

well as on Dr. Flomenbaum's own education and his experience as a medical examiner. As we explained in *Commonwealth* v. *Nardi, supra* at 388-391, the fact that a medical examiner's opinion is based "in large part" on findings made during the course of an autopsy that he did not perform "does not infringe on [the defendant's] right to confrontation" because the defendant has an opportunity to cross-examine the expert about his opinion and the underlying facts or data, "including that [the expert] did not personally conduct the relevant tests and examinations." *Id.* at 390.

Dr. Flomenbaum, however, also testified on direct examination to many of the specific findings made by Dr. Weiner in the autopsy report, including the manner in which the bullet penetrated the victim's forearm and then penetrated his chest, causing internal bleeding in the victim's chest, heart, and liver. This constituted testimonial hearsay and violated the defendant's right of confrontation.[23] See *id.* at 391-394. The testimony should not have been admitted. See *Commonwealth* v. *Avila, supra* at 763 (defendant's confrontation right violated by hearsay testimony of medical examiner about findings of another doctor's autopsy report).[24] The improperly admitted testimony did not, however, result in a substantial likelihood of a miscarriage of justice. *Id.* Neither the cause of death nor any other aspect of the autopsy report was a central issue at trial. See *Commonwealth* v. *Hensley*, 454 Mass. 721, 733 (2009) (medical examiner's testimony admitted in error, but "such error was harmless where the cause of death was not a contested issue at trial"). The defendant confessed to a State trooper that he shot the victim in the chest, and did not suggest otherwise at trial.[25]

[23]Dr. Weiner's findings, as testified to by Dr. Flomenbaum, were testimonial because "a reasonable person" in Dr. Weiner's position would anticipate his findings and conclusions "being used against the accused in investigating and prosecuting a crime." *Commonwealth* v. *Nardi*, 452 Mass. 379, 394 (2008), quoting *Commonwealth* v. *Gonsalves*, 445 Mass. 1, 3, (2005), cert. denied, 548 U.S. 926 (2006).

[24]The trial in this case took place in December, 2005. This is the defendant's direct appeal. The defendant receives the benefit of our decision in *Commonwealth* v. *Nardi, supra,* and other related precedents because his case was awaiting appellate review when they were decided. See *Commonwealth* v. *Avila*, 454 Mass. 744, 763 (2009).

[25]Dr. Flomenbaum's testimony did suggest that the victim's hands may

Having reviewed all aspects of the record in accordance with our obligations under G. L. c. 278, § 33E, we discern no substantial likelihood of a miscarriage of justice in the defendant's murder conviction. The verdict is amply supported by the evidence and is consonant with justice. We decline to exercise our power to reverse the verdict and order a new trial, or reduce the conviction to a lesser degree of guilt.

*Judgments affirmed.*

have been raised in a protective manner when he was shot. That testimony would have been damaging to a defense strategy of self-defense, but, as explained earlier, the defendant did not present a viable theory of self-defense even in the absence of this testimony.