Edward MARTINEZ, Petitioner,

v.

Luis SPENCER, Superintendent,
Old Colony Correctional
Center, Respondent.

No. CIV.A. 00CV11765RGS.

United States District Court,
D. Massachusetts.

Feb. 14, 2002.

Edward Martinez, Bridgewater, MA, Pro se.

Thomas Dee, Assistant Attorney General, Criminal Bureau, Boston, MA, Respondent.

## ORDER

STEARNS, District Judge.

On January 25, 2002, the petitioner filed an objection to Magistrate Judge Bowler's Report and Recommendation. Despite petitioner's argument that trial counsel's failure to impeach Melissa Gaulin, and his failure to seek to exclude inadmissible evidence that bolstered her testimony, constituted ineffective assistance, I agree with Magistrate Judge Bowler's careful analysis, and her conclusion that counsel's performance did not fall below an objective standard of reasonableness. Petitioner's principal argument regarding alleged prosecutorial misconduct is even less compelling, see *Portuondo v. Agard*, 529 U.S. 61, 73, 120 S.Ct. 1119, 146 L.Ed.2d 47 (2000), while the remaining arguments, for the most part, involve rulings of state law which are non-reviewable by a federal habeas court. Accordingly, the court *ADOPTS* the Magistrate Judge's Report and Recommendation. The motion to dismiss the Petition is *ALLOWED*.

SO ORDERED.

## REPORT AND RECOMMENDATION RE: RESPONDENT'S MEMORANDUM AND SUPPLEMENTAL MEMORANDUM OF LAW IN OPPOSITION TO PETITION FOR WRIT OF HABEAS CORPUS (*DOCKET ENTRY ## 27 & 32*)

BOWLER, United States Magistrate Judge.

Respondent Luis Spencer ("respondent"), Superintendent of Old Colony Cor-

rectional Center ("OCCC") in Bridgewater, Massachusetts, seeks dismissal of the remaining three claims[1] in the above styled petition for writ of habeas corpus filed *pro se* by petitioner Edward Martinez ("petitioner"), an inmate at OCCC. Respondent submits that the relevant state court's determinations were not contrary to or an unreasonable application of clearly established law as determined by the Supreme Court under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d) ("section 2254"). Respondent also argues that certain claims involve solely issues of state law or are in procedural default. As to the two additional claims contained in petitioner's supporting memorandum, respondent maintains they involve issues of state law which petitioner failed to exhaust. (Docket Entry ## 27 & 32).

Even if an evidentiary hearing is not barred under section 2254(e)(2) of the AEDPA,[2] petitioner has no right to an evidentiary hearing under the pre-AEDPA standard, assuming, *arguendo*, its applicability after the AEDPA's enactment. *See Edwards v. Murphy*, 96 F.Supp.2d 31, 49–50 (D.Mass.2000) (setting forth relevant standards and recognizing dispute as to whether standard for conducting evidentiary hearing set forth in *Townsend v. Sain*, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963), as modified by *Keeney v. Tamayo-Reyes*, 504 U.S. 1, 112 S.Ct. 1715, 118 L.Ed.2d 318 (1992), remains applicable af-

---

1. Ground four was dismissed without prejudice. (Docket Entry # 28).

2. Section 2254(e)(2) creates a bar to conducting an evidentiary hearing in federal court. If the petitioner fails to develop the facts within the meaning of the first clause of section 2254(e)(2), this court cannot hold an evidentiary hearing unless the petitioner "meets the other conditions of § 2254(e)(2)."

*Williams v. Taylor*, 529 U.S. 420, 430, 120 S.Ct. 1479, 146 L.Ed.2d 435 (2000). Under the first clause of section 2254(e)(2), "a failure to develop the factual basis of a claim is not established unless there is a lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel." *Williams v. Taylor*, 529 U.S. at 432, 120 S.Ct. 1479.

ter AEDPA's enactment); *see also Fryar v. Bissonnette*, 113 F.Supp.2d 175, 179–180 (D.Mass.2000) (the petitioner did not negligently fail to develop record under section 2254(e)(2) and could, therefore, only obtain hearing if he satisfied *Townsend* standard); *Marshall v. Hendricks*, 103 F.Supp.2d 749, 770 (D.N.J.2000) (same). The content of the record, consisting of state court records, including the probable cause hearing, the trial and the state courts' factual findings, are not in dispute.

## BACKGROUND

On September 28, 1994, a grand jury sitting in Middlesex County indicted petitioner on one count of first degree murder and one count of possession of an unlicensed firearm. On February 13, 1996, a jury convicted petitioner of both charges.

Petitioner filed a direct appeal to the SJC. After consolidating prior proceedings, the SJC conducted a review of the entire record under Massachusetts General Laws chapter 278, section 33E ("section 33E") and upheld the conviction.[3]

In the present petition, petitioner attacks his 1996 conviction on the following three grounds: (1) ineffective assistance of trial counsel due to his failure to impeach Melissa Gaulin ("Gaulin") and his failure to move for the exclusion of inadmissible evidence (a prior consistent statement) which bolstered Gaulin's credibility; (2) ineffective assistance of trial counsel due to trial counsel's failure to object to prosecutorial misconduct during cross examination of petitioner and closing argument; and (3) prosecutorial misconduct on various grounds. (Docket Entry # 20). The memorandum in support of the petition contains the following additional grounds:

(5)[4] cumulative prejudice resulting from the prosecutorial misconduct during cross examination of petitioner; and (6) the trial judge's improper admission of the prior consistent statements made by Jaquay Abreu to the police. (Docket Entry # 18, pp. 18–19 & 22–24).

■ Consistent with pre-AEDPA law, the AEDPA affords "a presumption of correctness to any 'determination of a factual issue made by a State court.'" *Bryson v. Ward*, 187 F.3d 1193, 1211 (10th Cir.1999), *cert. denied*, 529 U.S. 1058, 120 S.Ct. 1566, 146 L.Ed.2d 469 (2000). "For this purpose, factual issues are defined as basic, primary, or historical facts: facts in the sense of a recital of external events and the credibility of their narrators." *Coombs v. State of Maine*, 202 F.3d 14, 18 (1st Cir.2000); *accord Sanna v. Dipaolo*, 265 F.3d 1, 7 (1st Cir.2001). With respect to the factual findings of the Massachusetts Supreme Judicial Court ("the SJC"), such deference is particularly appropriate where, as here, the SJC "gave the trial record the type of scrutiny mandated by [section 33E]." *Avellar v. DuBois*, 30 F.Supp.2d 76, 79 (D.Mass.1998).

In an exhaustive and detailed recital, the SJC, viewing the record in the Commonwealth's favor, found the following facts, which petitioner fails to rebut:

(a) *The events leading up to the murder* ... [Petitioner], was convicted of the premeditated murder of Freddys Abreu. [Petitioner] and the victim lived in the same apartment building. [Petitioner] shared an apartment with his father, his girlfriend, Melissa Gaulin, and Gaulin's

---

3. The June 21, 2001 Report and Recommendation recites additional procedural background which need not be repeated.

4. To avoid confusion due to the dismissal of ground four, this court labels the additional claims grounds five and six.

baby.[5] The victim shared an apartment with his wife, Jaquay Abreu, and their daughter. The two couples were friendly with one another and visited one another's apartments. Jaquay Abreu, the victim's wife, testified that she also spoke with [petitioner] on the telephone.

The victim sold crack cocaine and, shortly after moving into the apartment building, asked [petitioner] to join him in selling drugs. [Petitioner] and the victim sold crack cocaine out of the apartment building for approximately two or three months before the murder.

Sometime before the murder, the victim purchased a silver handgun. Because the victim's wife objected to having a handgun in their home, the victim asked [petitioner] to keep the gun for him. The victim also gave [petitioner] approximately $1,000 worth of cocaine to hold. One day later, the victim asked [petitioner] to return the gun and the cocaine. [Petitioner] refused to do so. An argument ensued. Two days later, [petitioner]'s girl friend, Gaulin, reported to the police that the victim had been looking for [petitioner] and had threatened to kill [Gaulin]. Afraid, Gaulin went to stay with [petitioner]'s sister.

(b) *The murder.* The next day, the victim, who apparently was friendly with [petitioner]'s father, went to [petitioner]'s apartment with a frozen dinner for [petitioner]'s father. At approximately 10 p.m., the victim left the apartment building in his car and drove to [petitioner]'s sister's apartment. [Petitioner] came out to the victim's car along with Jacob Sanchez, [petitioner]'s nephew. There was a brief argument, after which the victim drove away.

According to the testimony of Gaulin, Jacob Sanchez told [petitioner] to "get the gun." Gaulin saw [petitioner] take the silver gun from a bag in his sister's apartment and put it back. She then went upstairs. [Petitioner] and Sanchez left.[6]

At approximately 10:20 p.m., the victim returned to his apartment building. His wife heard his car pull up and looked out the window. She saw three men, dressed in dark clothing and hooded sweatshirts, approach her husband's car. She recognized one of the men as [petitioner] by his voice. The victim's wife saw [petitioner] pull out a gun and fire it twice at the victim. She recognized the gun as the silver gun the victim had given [petitioner] several days earlier.

That night, [petitioner] returned to his sister's apartment alone. Gaulin noticed that he was shaking and sweating. He told her, "I did it," or "[w]e did it," and stated that he "didn't want to kill him." [Petitioner] also told Gaulin that he had gotten rid of the gun.

(c) *[Petitioner]'s arrest.* The night of the murder, the victim's wife told the police that she had witnessed [petitioner] murder her husband. The police began a search of the area. The next morning, the police learned that [petitioner] was at his sister's apartment. When the police found him, [petitioner] agreed to speak with them at the police station.

[Petitioner] initially denied knowing the victim. Later in the interview, however, [petitioner] admitted to selling crack cocaine for the victim. [Petitioner] also told the police that he had sev-

---

5. As found by the trial judge, Gaulin moved in with petitioner in January 1994. The Abreus moved into the same apartment complex in March 1994.

6. During Gaulin's testimony, she became upset which necessitated an extended recess.

ered his relationship with the victim several days earlier because the victim was not paying him enough. [Petitioner] said that he knew the police were looking for him and that he had run to another floor in the apartment building to hide earlier that day. When the police asked why [petitioner] thought the police were looking for him, [petitioner] terminated the interview.

*Commonwealth v. Martinez*, 431 Mass. 168, 726 N.E.2d 913, 919–920 (2000). At trial, Jaquay Abreu testified that on the evening of the murder, she looked out the window of her apartment and saw three men approach her husband who was in his car. She recognized one of the men as petitioner by the sound of his voice and her view from the window. She then saw petitioner take the silver gun and fire it twice at her husband.

In addition to Jaquay Abreu's incriminating testimony, Gaulin testified that petitioner returned to his sister's apartment shortly after the time of the murder and said, "I did it." He was perspiring and appeared nervous and upset.

In contrast, petitioner testified that Jacob Sanchez suggested they murder the victim. Petitioner stated that he took the silver gun out of the bag in his sister's apartment shortly before the murder but then put it back into the bag because Gaulin became upset.

Petitioner further testified that he went to the apartment building on the night of the murder because he was concerned about his father's safety. He denied shooting the victim. According to petitioner's testimony, he was knocking on the door of his father's apartment at the time of the shooting.

The factual findings by the trial judge, which petitioner likewise fails to rebut, concern, in pertinent part, the actions which took place at the police station be-

tween the police and Gaulin. In particular, during police interviews, Gaulin made certain inculpatory, consistent statements about admissions made by petitioner on the night of the murder. Thereafter, at a probable cause hearing, Gaulin made a number of exculpatory, inconsistent statements about the events:

> After [petitioner] was arrested on June 10, 1994, the police came to the apartment of Carmen Martinez, [petitioner's sister], and requested that Ms. Gaulin accompany them to the station for questioning.
>
> When she arrived at the station, she was taken to an interview room, given her *Miranda* rights and asked about her relationship with [petitioner] and her knowledge of [the victim]. She answered the questions about these relationships. Later at a probable cause hearing, Ms. Gaulin testified that the police had told her that she could stop answering questions at any time. She stated that she told them, "I don't want to talk no more." She claimed that the police said she had to talk or she would be charged as an accomplice, get in trouble and be arrested. She stated further that the police told her she would go to jail, get the same amount of time as [petitioner] and that they would take her baby.
>
> Melissa responded, "Why should I have to talk?" The police replied, "Just tell us what you know and then it will be over." Melissa proceeded to tell them, in pertinent part, that [petitioner] was with her in Carmen's apartment after the meeting with [the victim] on the street. She said that she fell asleep and that Edward was present in the apartment when she fell asleep and that he was there when she woke up.
>
> In summary, Mrs. Gaulin was reluctant initially to answer questions con-

cerning her knowledge of the events of the evening of June 9, 1994. Subsequently, she was coerced by the police into answering further and gave a statement exculpating [petitioner] by providing him with an alibi.

Ms. Gaulin was told to wait until the police interviewed [petitioner]'s father and she remained in a waiting area for about one and a half hours. During the waiting period, [petitioner], handcuffed and in the company of two officers, passed by her and said, "Remember that I didn't do it."

After her wait, the officers returned and said, "Everything you said was wrong." They threatened that if they found out she was lying, they would arrest her and she would lose her daughter. The threat was embellished by telling her that she would go to Framingham and that she would not be able to handle Framingham.

Melissa's second statement on that day recounted that [petitioner] left the area in the company of his nephew and others after the conversation with [the victim] and returned later to his sister's apartment in the company of others except for the nephew. She told police that [petitioner] was upset and sweating. He said to her, "I did it." At a later point, [petitioner] told her, "I didn't want to kill him." At the completion of the second statement, Melissa was sent home.

A probable cause hearing was conducted in the Lowell District Court and Melissa Gaulin was subpoenaed by the Commonwealth to testify on July 12, 1994. About a week before the 12th, Melissa had moved in with her child to the apartment of Carmen Martinez. At that point, Melissa considered herself [petitioner]'s girlfriend.

At the probable cause hearing, Melissa softened her description of [petitioner]'s demeanor upon his return to the perception that he was "upset" and his statement to her was "Something happened." When the prosecutor presented her with a signed copy of her second statement to the police, she claimed that she could not recall telling the police that [petitioner] said "I did it." Shortly thereafter, she insisted that she told the police that [petitioner] said, "We did it," and continued to maintain her position that she never told the police that [petitioner] said "I did it." The defense attorney at the probable cause hearing solicited the testimony from Melissa about the dire warnings or threats by the police concerning the consequences to her if she lied.

(Docket Entry # 22, Ex. 8).

Thus, on direct examination at the probable cause hearing, the prosecutor impeached Gaulin with the second, inculpatory statement she made to the police. Gaulin acknowledged that the statement was a copy of the statement she gave to the police with her signature at the bottom. After the second statement refreshed her memory, she testified that petitioner told her, "[H]e did not want to kill him." The prosecutor then ended direct examination without Gaulin testifying to the police threats preceding the inculpatory statement.

On cross examination, defense counsel, who was not trial counsel, had Gaulin testify about the police threats that preceded both the exculpatory and the inculpatory statements. On redirect, the prosecutor asked Gaulin if she made the first statement to protect her boyfriend and Gaulin answered, "Yes." She also testified on redirect that she gave the first statement be-

cause the police threatened her about jail and her baby.[7]

## DISCUSSION

Respondent initially maintains that grounds one through three do not involve decisions that were "contrary to" or an "unreasonable application" of clearly established Supreme Court precedent.

Section 2254(d)(1) establishes "two categories of cases in which a state prisoner may obtain federal habeas relief with respect to a claim adjudicated on the merits in state court." *Williams v. Taylor,* 529 U.S. 362, 404, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). Under the first category, a federal court may grant the writ if the relevant state court proceeding resulted in a decision that was " 'contrary to clearly established Federal law, as determined by the Supreme Court of the United States.' " *Williams v. Taylor,* 529 U.S. at 404, 120 S.Ct. 1495 (quoting statute with ellipses omitted). Under the second category, the federal court may grant the writ if the relevant state court decision " 'involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States.' " *Williams v. Taylor,* 529 U.S. at 405, 120 S.Ct. 1495 (quoting statute with ellipses omitted).

A state court decision is "contrary to" clearly established federal law as determined by the Supreme Court, if the decision "applied a rule that contradicts the governing law set forth in the [Supreme] Court's cases." *Mountjoy v. Warden, New Hampshire State Prison,* 245 F.3d 31, 35 (1st Cir.2001). A state court decision is also "contrary to the [Supreme] Court's clearly established precedent if the

state court confronts a set of facts that are materially indistinguishable from a decision of the [Supreme] Court and nevertheless arrives at a result different from our precedent." *Hurtado v. Tucker,* 245 F.3d 7, 15 (1st Cir.2001) (internal brackets omitted), *cert. denied,* —— U.S. ——, 122 S.Ct. 282, 151 L.Ed.2d 208 (2001). In other words, a state court decision is contrary to "clearly established federal law if it applies a legal rule that contradicts" the "prior holdings" of the Supreme Court "or if it reaches a different result from" a Supreme Court case "despite confronting indistinguishable facts." *Ramdass v. Angelone,* 530 U.S. 156, 165, 120 S.Ct. 2113, 147 L.Ed.2d 125 (2000); *accord Williams v. Taylor,* 529 U.S. at 405–406, 120 S.Ct. 1495 (contrary decision occurs where state court "applies a rule that contradicts the governing law set forth in [Supreme Court] cases" or "confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent"). In short, a petitioner "may succeed under the 'contrary to' clause only if Supreme Court caselaw directly governs the claim and the state court got it wrong." *Vieux v. Pepe,* 184 F.3d 59, 63 (1st Cir.1999), *cert. denied,* 528 U.S. 1163, 120 S.Ct. 1178, 145 L.Ed.2d 1086 (2000).

Under the second prong, the court determines whether "the state court's use of (or failure to use) existing law in deciding the petitioner's claim involved an 'unreasonable application' of Supreme Court precedent." *O'Brien v. Dubois,* 145 F.3d 16, 23 (1st Cir.1998). The "touchstone [is] 'objective unreasonableness.' " *Ballinger v. Byron,* 98 F.Supp.2d 119, 126 (D.Mass.2000) (discussing *Tay-*

---

**7.** Additional facts are detailed in the discussion section with respect to the particular argument.

*lor* ). The inquiry distills into a " 'question of whether the state court's derivation of a case-specific rule from the Court's generally relevant jurisprudence appears objectively reasonable.' " *Kibbe v. DuBois,* 269 F.3d 26, 36 (1st Cir.2001)[8] (quoting *O'Brien v. Dubois,* 145 F.3d 16, 25 (1st Cir.1998); emphasis omitted). Thus, in "making the 'unreasonable application' inquiry," a federal habeas court "should ask whether the state court's application of clearly established federal law was objectively unreasonable." *Williams v. Taylor,* 529 U.S. at 365, 120 S.Ct. 1495. An "unreasonable application" of clearly established federal law as determined by the Supreme Court occurs where " 'the state court identifies the correct governing legal rule from [the Supreme Court's] cases but unreasonably applies it to the facts of the particular state prisoner's case,' or 'if the state court either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply.' " *Mountjoy v. Warden, New Hampshire State Prison,* 245 F.3d at 35.

■ An objectively unreasonable application of the relevant jurisprudence, however, differs from an incorrect or erroneous application of such jurisprudence. *Williams v. Taylor,* 529 U.S. at 365, 120 S.Ct. 1495. Under the unreasonable application prong, the "habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must *also* be unreasonable." *Williams v. Taylor,* 529 U.S. at 365, 120 S.Ct. 1495 (emphasis added); *see Mountjoy v. Warden, New Hampshire State Prison,* 245

F.3d at 35 (distinguishing unreasonable application from incorrect application); *Williams v. Matesanz,* 230 F.3d 421, 425 (1st Cir.2000).

■ Lower federal court decisions do not constitute "clearly established" law within the meaning of section 2254(d)(1) because such decisions do not emanate from the Supreme Court. *Phoenix v. Matesanz,* 233 F.3d 77, 84 n. 3 (1st Cir.2000). Nevertheless, lower federal court decisions provide insight and guidance as to the reasonableness of the state court's decision. *O'Brien v. Dubois,* 145 F.3d at 25. Thus, if a lower federal court decision applies Supreme Court law to a similar fact pattern and arrives at a different result than the state court, the lower federal court's decision is an appropriate reference in assessing the reasonableness of the state court's decision. *See Phoenix v. Matesanz,* 233 F.3d at 84 n. 3. Conversely, a state court's application of federal law is not unreasonable "when federal courts— typically the circuit courts of appeals— regularly resolve cases in a similar fashion." *Bui v. DiPaolo,* 170 F.3d 232, 243 (1st Cir.1999), *cert. denied,* 529 U.S. 1086, 120 S.Ct. 1717, 146 L.Ed.2d 640 (2000).

A. *Ground One*

■ In ground one, petitioner alleges ineffective assistance of trial counsel due to his failure to impeach Gaulin and his failure to move for the exclusion of inadmissible evidence bolstering Gaulin's credibility. (Docket Entry # 20, ¶ 12(A)). The parties agree that petitioner exhausted this federal constitutional claim of ineffective assistance of counsel as well as the ineffective assistance of counsel claim in ground two. The SJC considered ground one, as well as ground two, however, only under the miscarriage of justice standard

---

8. Publication page numbers are not yet available for the Federal Reporter citation.

of review applicable to appeals in capital cases under section 33E. The section 33E miscarriage of justice standard is "more favorable to a defendant than is the standard applied to a claim of ineffective assistance of counsel." *Commonwealth v. Martin*, 427 Mass. 816, 696 N.E.2d 904, 905 n. 2 (1998); *accord Commonwealth v. Wright*, 411 Mass. 678, 584 N.E.2d 621, 624 (1992).⁹ Under this more favorable standard, the SJC considers the "claim even if the alleged error on the part of trial counsel does not constitute conduct falling measurably below that of an ordinary fallible lawyer." *Commonwealth v. Parker*, 420 Mass. 242, 649 N.E.2d 727, 729–730 (1995) (internal quotation marks omitted); *accord Commonwealth v. Martin*, 696 N.E.2d at 907 (test in capital cases "devotes no attention" to "whether counsel's behavior fell measurably below what is expected of an ordinary fallible lawyer"). Rather, the SJC determines if trial counsel made an error and, if so, "whether that error was likely to have influenced the jury's conclusion." ¹⁰ *Commonwealth v. Wright*, 584 N.E.2d at 624.

▮ The AEDPA's strict standard of review under section 2254(d), however, applies only when the state court addressed the federal claim on the merits. *Fortini, III v. Murphy*, 257 F.3d 39, 44 (1st Cir. 2001).¹¹ Because the SJC did not decide whether petitioner was denied effective assistance of trial counsel under the Sixth Amendment, section 2254(d) review does not apply. Accordingly, this court reviews the ineffective assistance of counsel claims de novo under the parameters of *Strickland v. Washington*, 466 U.S. 668, 104

S.Ct. 2052, 80 L.Ed.2d 674 (1984), and its progeny.

▮ Under *Strickland*, the petitioner has the burden to show by a preponderance of the evidence that: "(1) counsel's performance fell below an objective standard of reasonableness, and (2) there is a reasonable probability that, but for counsel's error, the result of the proceedings would have been different." *Smullen v. United States*, 94 F.3d 20, 23 (1st Cir. 1996); *accord Gonzalez–Soberal v. United States*, 244 F.3d 273, 277 (1st Cir.2001) (same). Under the first prong, the petitioner must show that " 'counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.' " *Smullen v. United States*, 94 F.3d at 23 (quoting *Strickland v. Washington*, 466 U.S. at 687, 104 S.Ct. 2052). Furthermore, under *Strickland*, there is "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' " *Strickland v. Washington*, 466 U.S. at 689, 104 S.Ct. 2052.

▮ Under the second prong which requires a showing of prejudice, the focus is upon "the 'fundamental fairness of the proceeding.' " *Gonzalez–Soberal v. United States*, 244 F.3d at 278; *accord Lockhart v. Fretwell*, 506 U.S. 364, 372, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993) (prejudice prong focuses on "whether counsel's deficient performance renders the result of the trial

---

9. Indeed, the SJC's opinion in the case at bar cites to *Wright* a number of times. *Commonwealth v. Martinez*, 726 N.E.2d at 928 & 929.

10. It is true that this lower standard of review "meets, at least, the standards of review mandated by both the Federal and State constitu-

tional provisions." *Commonwealth v. Parker*, 649 N.E.2d at 730 n. 5.

11. The Second Circuit recently adopted a contrary position. *See Sellan v. Kuhlman*, 261 F.3d 303, 309–312 (2nd Cir.2001).

unreliable or the proceeding fundamentally unfair"). A "reasonable probability" is therefore "one 'sufficient to undermine the confidence in the outcome.'" *Gonzalez–Soberal v. United States,* 244 F.3d at 278 (quoting *Strickland v. Washington,* 466 U.S. at 694, 104 S.Ct. 2052). The petitioner must show "that counsel's errors were so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable." *Strickland v. Washington,* 466 U.S. at 687, 104 S.Ct. 2052; *see also Lockhart v. Fretwell,* 506 U.S. at 372, 113 S.Ct. 838 ("[u]nreliability or unfairness does not result if the ineffectiveness of counsel does not deprive the defendant of any substantive or procedural right to which the law entitled him"). Unlike the section 33E miscarriage of justice standard, the petitioner is not required to "prove that the errors were more likely than not to have affected the verdict." *Gonzalez–Soberal v. United States,* 244 F.3d at 278.

Turning to trial counsel's failure to exclude the prior consistent statement (Docket Entry # 20, ¶ 12(A); Docket Entry # 18, ¶ I(A)), on direct examination, Gaulin testified that petitioner returned to his sister's apartment at around 11 p.m. on the night of the murder and admitted to Gaulin, "I did it." The prosecutor then impeached Gaulin preemptively by eliciting that she gave two prior statements to the police.[12] Gaulin's first statement was that petitioner was present with her in the apartment when she fell asleep and that he was there with her when she woke up. As correctly noted by the SJC, this first statement "was inconsistent with Gaulin's trial testimony." *Commonwealth v. Martinez,* 726 N.E.2d at 929.

Gaulin's second statement to the police (that petitioner told her that he did it), however, corroborated Gaulin's trial testimony. Petitioner takes issue with trial counsel's failure to object to the admission of this testimony.[13] (Docket Entry ## 18 & 20).

Trial counsel's performance, while a mistake in hindsight, does not fall below an objective standard of reasonableness. Gaulin gave the prior consistent and inconsistent statements only two to three hours apart. Thus, the jury heard that Gaulin gave two different versions of the events to the police at the same time. The proximity in time of both statements emphasized to the jury that Gaulin was not a credible witness. In short, she was a witness who gave different stories about the same incident at the same time. In deciding not to object to the admission of the consistent statement in this context, trial counsel reasonably chose to leave the jury with the impression of a witness who simultaneously gave different stories about the same event. Indeed, trial counsel's cross examination of Gaulin elicited the fact that Gaulin had, within hours, given the police two contradictory statements. (Tr. 4–158–159). Recognizing that Gaulin was already effectively impeached, trial counsel focused the cross examination on Gaulin's observations of petitioner and Sanchez on the night of the murder in an attempt to draw out the theory that Sanchez, not petitioner, was the killer. (Tr. 4–168–176). Such strategic decisions do not amount to deficient performance under *Stickland.*[14] *See*

12. The trial judge's findings *supra* recite these statements.

13. A review of Gaulin's trial testimony shows that the prosecutor elicited the information regarding the prior consistent statement before admission into evidence of any testimony

regarding Gaulin's deteriorating relationship with petitioner.

14. Counsel may also have posited that a charge of recent fabrication would make the admission of the prior consistent statement inevitable. *See Commonwealth v. Saarela,*

generally *United States v. Tabares,* 951 F.2d 405, 409 (1st Cir.1991).

█ As to prejudice, the Commonwealth had a strong case. Jaquay Abreu, who knew petitioner, had spoken with him on the telephone and lived in the same building, consistently testified that she saw petitioner shoot her husband and heard his voice. Jaquay Abreu also recognized the gun as the same silver gun her husband had given petitioner a few days before the murder. There was also a motive because petitioner had refused to return the cocaine and the gun to the victim.

In addition, the admission of Gaulin's prior consistent and inculpatory statement at a time when she also made an entirely different exculpatory statement served to emphasize to the jury that she was not a credible witness. As previously posited, the erroneous decision did not prejudice petitioner because the admission of the two diametrically divergent statements served to demonstrate to the jury that Gaulin's testimony should not be believed.

█ Focusing on the fairness of the admission of the consistent statement and trial counsel's failure to object, trial counsel's impeachment of Gaulin was effective notwithstanding the admission of the prior consistent statement. In front of the jury, Gaulin's emotional instability necessitated a two hour recess.[15] She gave two different stories about what happened under similar circumstances inasmuch as police threats preceded both the exculpatory and inculpatory statements. The admission of the consistent statement through trial counsel's failure to object did not render the trial's result unreliable.

█ Petitioner also complains about trial counsel's failure to impeach Gaulin with the circumstances under which she gave the consistent statement to the police, as shown in the transcript of the probable cause hearing.[16] (Docket Entry # 20,

---

376 Mass. 720, 383 N.E.2d 501, 504 (1978) (finding no prejudicial error to premature admission of prior consistent statement which would have been admitted under customary order of questioning due to charge of recent contrivance). On cross examination, however, Gaulin may have proved too unstable to question further about such a charge contained in one or more letters that Gaulin wanted to harm petitioner because he terminated their relationship. Trial counsel averred that he had the letters in his possession but decided not to use them as a matter of trial strategy. (Docket Entry # 22, Ex. 5).

To the extent petitioner raises a separate claim of ineffective assistance of trial counsel due to his failure to impeach Gaulin with these letters, the decision, given the circumstances, particularly Gaulin's emotional instability on the stand, was strategic. Trial counsel could not be certain how Gaulin would testify about the deterioration of her relationship with petitioner and her purported motive to harm petitioner by giving damaging testimony on the witness stand. In any event, petitioner was not prejudiced. Gaulin was already effectively impeached in the sense that the jury heard the testimony that she gave two different stories to the police and a different version at the probable cause hearing. The jury then witnessed her emotional instability and unreliability first hand.

15. The trial judge describes the emotional breakdown on the witness stand in great detail. (Docket Entry # 22, Ex. 8, pp. 8–10).

16. Petitioner submits that these circumstances gave Gaulin a "motive to lie." Petitioner further maintains that trial counsel failed to use the transcript of the probable cause hearing to impeach Gaulin. Pertinent portions of the transcript show that, shortly before Gaulin made the second statement, the police threatened Gaulin by "saying that [your] daughter will go to DSS" and that Gaulin will " 'go to jail, to Framingham, and you won't be able to handle it in Framingham.' " (Docket Entry # 22, Ex. 5, pp. 102–103). The trial judge also accurately summarized the circumstances that surrounded the second statement by noting, as previously quoted, that:

After [Gaulin's] wait, the officers returned and said, "Everything you said was wrong."

¶ 12(A); Docket Entry # 18, ¶ I(B)). The relevant factual findings, which petitioner fails to rebut,[17] include the trial judge's finding that the police gave Gaulin "the same warnings of [the] consequences" before she gave the first statement which exculpated petitioner as they did before she gave the second statement which inculpated petitioner.[18] Likewise, the SJC agreed with the trial judge who "found that the police threatened Gaulin before each of her statements." *Commonwealth v. Martinez*, 431 Mass. at 185, 726 N.E.2d 913.

Trial counsel's decision not to use the police threats because they preceded both the favorable inconsistent statement as well as the unfavorable consistent statement, therefore, amounted to appropriate trial strategy. As reflected in the transcript of the probable cause hearing and noted by the trial judge, defense counsel in that proceeding did elicit the police threats before the consistent statement, a strategy which resulted in the prosecution eliciting damaging testimony on redirect from Gaulin that she gave the first exculpatory statement "to protect her boyfriend." (Docket Entry # 22, Ex. 8; Docket Entry # 22, Ex. 5, p. 158). Thus, this court agrees with the analysis employed by the trial judge that:

> Trial counsel had to weigh the value of bringing in the theory of a change of

story based upon the threats in light of the Commonwealth's opportunity to show that similar threats were made during the first statement resulting in an exculpatory statement relating to [petitioner]'s conduct combined with the witness's statement at probable cause that she gave the first version because she wanted to protect her boyfriend. (Docket Entry # 22, Ex. 8).

 Even assuming *arguendo* that trial counsel's performance was deficient, again, the result did not prejudice petitioner. Because police threats preceded both the inculpatory and the exculpatory statements, bringing in evidence of the threats preceding the inculpatory statement on cross examination conceivably opened the door for the prosecution to show the threats preceding the exculpatory statement on redirect. Presenting the jury with evidence of the threats preceding both statements does not prejudice petitioner any more than omitting the evidence of the threats. The result of the trial is reliable in both instances. Trial counsel's failure to elicit the evidence of the threats preceding the inculpatory statement on cross examination, given the strong likelihood of the prosecution bringing in the evidence of the corresponding threats preceding the exculpatory statement on redirect, did not deprive petitioner of a fair trial.

> They threatened that if they found out she was lying, they would arrest her and she would lose her daughter. The threat was embellished by telling her that she would go to Framingham and that she would not be able to handle Framingham.
> (Docket Entry # 22, Ex. 8).

17. Even applying pre-AEDPA law, these facts are presumed correct absent special circumstances. *See Washington v. Schriver*, 255 F.3d 45, 55 (2nd Cir.2001) (applying pre-AEDPA law because state court decision was not on the merits within the meaning of section 2254(d) and therefore applying pre-AEDPA

standard of presuming factual findings of state court correct). No such circumstances exist.

18. In particular, before the first statement, as noted by the trial judge and previously quoted *supra*, Gaulin "claimed that the police said she had to talk or she would be charged as an accomplice, get in trouble and be arrested. She stated further that the police told her she would go to jail, get the same amount of time as [petitioner] and that they would take her baby." (Docket Entry # 22, Ex. 8).

■ Petitioner additionally challenges trial counsel's failure to impeach Gaulin's trial testimony with prior inconsistent statements made during the probable cause hearing. (Docket Entry # 20, ¶ 12(A); Docket Entry # 18, ¶ I(C)). At trial, Gaulin testified that petitioner said to her, "I did it." (Docket Entry # 22, Ex. 8). Petitioner faults trial counsel for not impeaching Gaulin with her testimony at the probable cause hearing that, despite repeated questioning, Gaulin testified that she said "we" and not "I." (Docket Entry # 18). Gaulin also repeatedly testified that, after petitioner returned to his sister's apartment on the night of the murder, he said, "We did it." (Docket Entry # 22, Ex. 5, pp. 42–45 & 136).

First and foremost, reviewing the trial transcript, trial counsel did not completely omit an entire line of questioning about the inconsistent statements during the probable cause hearings. Rather, he pointed them out to the jury but did not repeatedly remind the jury of the inconsistencies. (Tr. 4–176–177). Such performance was not deficient particularly in light of the fragile psychological state of the witness and trial counsel's legitimate uncertainty of what Gaulin might say on the stand.[19] Trial counsel rendered reasonable professional assistance.

■ The record also fails to show a reasonable possibility that, but for trial counsel's error, the result of the trial would have been different. Gaulin was already effectively impeached on direct examination when she admitted to giving the police two different accounts of the events. Trial counsel's failure to belabor the point

on cross examination did not render the result unreliable or unfair.

### B. *Ground Three*

■ In ground three, petitioner contends that certain alleged improprieties committed by the prosecution during the trial violated his rights under the fifth and fourteenth amendments and that the SJC's adjudications were contrary to or an unreasonable application of clearly established law as determined by the Supreme Court. (Docket Entry # 20). The memorandum in support of the petition details the improprieties. (Docket Entry # 18).

Petitioner initially takes issue with the first two questions the prosecutor posed to him. The prosecutor began her cross examination of petitioner with the following questions:

Q: "Sir, would you agree that you've had the advantage of hearing all the testimony in this case before you took the stand?"

A: "Yes."

Q: "So you've heard everybody's version of what they say happened before you've taken the stand?"

A: "Yes."

*Commonwealth v. Martinez*, 726 N.E.2d at 923 n. 8.

■ The SJC considered these questions improper but because the conduct only involved these two questions, the error did not require a new trial. *Commonwealth v. Martinez*, 726 N.E.2d at 923. Grounded on the constitutional principle of a defendant's right to remain silent, Mas-

---

19. In the Memorandum of Decision, the trial judge described trial counsel's assessment at the motion hearing of Gaulin "as a 'psychological mess' on the stand." Trial counsel also knew about Gaulin's various admissions to psychiatric wards. Her testimony during direct examination necessitated a two hour recess to calm her emotions. Accordingly, trial counsel "could not be sure of what [Gaulin] would say." (Docket Entry # 22, Ex. 8). Independently reviewing the record, this court agrees with the reasoning employed by the trial judge.

sachusetts law prohibits a prosecutor from arguing that " 'the jury should draw a negative inference from the fact that the defendant remained silent until he testified.' " *Commonwealth v. Sherick*, 401 Mass. 302, 516 N.E.2d 157, 157 (1987) (quoting *Commonwealth v. Person*, 400 Mass. 136, 508 N.E.2d 88, 91 (1987)). Citing *Person*, the SJC found that the prosecutor's questions were improper. But, unlike *Person*, which involved a prosecutor who made an extended closing argument that the defendant sat and listened to the testimony and then gave " 'a completely tailored cover story,' " *Commonwealth v. Martinez*, 726 N.E.2d at 923 n. 9 (quoting *Commonwealth v. Person*, 508 N.E.2d at 90, which reversed conviction), the SJC considered the impropriety not significant enough to warrant a new trial.

Respondent argues that the SJC decided an issue of state law which is not cognizable on federal habeas review. In the alternative, respondent asserts that the error did not have a substantial and injurious effect on the jury's verdict thereby foreclosing habeas relief under the standard enunciated in *Brecht v. Abrahamson*, 507 U.S. 619, 637, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993).

 Section 2254(a) jurisdictionally limits federal habeas relief to state convictions "in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a); *see also* 28 U.S.C. § 2241(c); 1 James S. Liebman & Randy Hertz, *Federal Habeas Corpus Practice and Procedure* § 9.1 (1998) ("jurisdictional prerequisite[ ] for federal habeas corpus review" requires a claim that custody was imposed " 'in violation of the Constitution or laws or treaties of the United States' "). Errors of state law that do not rise to the level of a constitutional error "may not be corrected on federal habeas." *Gilmore v. Taylor*, 508 U.S. 333, 348–349, 113 S.Ct. 2112, 124 L.Ed.2d 306 (1993) (O'Connor, J. concurring); *Sawyer v. Smith*, 497 U.S. 227, 239, 110 S.Ct. 2822, 111 L.Ed.2d 193 (1990) ("availability of a claim under state law does not of itself establish that a claim was available under the United States Constitution"); *accord Sanna v. Dipaolo*, 265 F.3d at 12–13 (habeas review unavailable for state law error except "extreme cases" where state law or practice betrays "fundamental principle of justice" under the Due Process Clause); *Hamm v. Latessa*, 72 F.3d 947, 954 (1st Cir.1995) ("federal habeas court will not disturb the state courts' construction or application of state law unless it can be shown that such construction or application offends the Constitution or some (applicable) federal statute"); *Restrepo v. Dipaolo*, 1 F.Supp.2d 103, 107 (D.Mass.1998) ("[e]rrors of state law do not provide a basis for habeas relief").

The SJC decided that under state law the prosecutor committed an error. Hence, its decision is not subject to federal habeas review.

 In the alternative, the claim does not set forth a violation of federal constitutional law.[20] Inasmuch as the SJC did not address the merits of the federal claim, the strict standard of section 2254(d)(1) does not apply. *Fortini, III v. Murphy*, 257 F.3d at 44. Applying the pre-AEDPA standard, it is significant that the prosecutor's comments occurred during cross examination as opposed to during closing argument. Even if they occurred during closing argument, however, they would not violate federal constitutional law as it ex-

---

**20.** Accordingly, this court need not discuss respondent's alternative basis for dismissal on the ground of harmless error.

ists today. *See Portuondo v. Agard,* 529 U.S. 61, 73, 120 S.Ct. 1119, 146 L.Ed.2d 47 (2000) (allowing prosecutor to comment in summation "upon the fact that a defendant's presence in the courtroom provides him a unique opportunity to tailor his testimony is appropriate").

Although the Supreme Court decided *Agard* after petitioner's trial, its reasoning about the prosecutor's ability to attack a defendant's credibility once the defendant takes the stand clarifies that the prosecutor's actions in the case at bar were entirely appropriate and did not infringe petitioner's constitutional rights to be present at trial and confront the witnesses against him and/or to testify on his own behalf under the sixth and fifth amendments.

■ First, the Supreme Court in *Agard* noted that the defendant lacked "any historical support" for the constitutional rights he asserted under the fifth and sixth amendments. *Portuondo v. Agard,* 529 U.S. at 67, 120 S.Ct. 1119. Second, because the prosecutor's comments during summation concerned the defendant's credibility as a witness, they "were in accord with our *longstanding* rule that when a defendant takes the stand, 'his credibility may be impeached and his testimony assailed like that of any other witness.'" *Portuondo v. Agard,* 529 U.S. at 69, 120 S.Ct. 1119 (quoting *Brown v. United States,* 356 U.S. 148, 154, 78 S.Ct. 622, 2 L.Ed.2d 589 (1958); emphasis added). Thus, "'when a defendant assumes the role of a witness, the rules that generally apply to other witnesses—rules that serve the truth-seeking function of the trial—are generally applicable to him as well.'" *Portuondo v. Agard,* 529 U.S. at 69, 120 S.Ct. 1119 (quoting *Perry v. Leeke,* 488

U.S. 272, 282, 109 S.Ct. 594, 102 L.Ed.2d 624 (1989)). To state the obvious, the Supreme Court decided both *Brown* and *Perry* before petitioner's trial. The reasoning in those cases belies any violation of federal constitutional law by the prosecutor in the case at bar.

■ Petitioner next argues that the prosecutor violated petitioner's right not to have his silence used against him when the prosecutor asked Inspector Gerald Wayne ("Wayne") of the Lowell Police Department about the termination of his post-*Miranda* interview with petitioner. Respondent asserts that the SJC's decision was not contrary to or an unreasonable application of clearly established federal law as determined by the Supreme Court. This court agrees.

The following exchange took place between the prosecutor and Wayne:

A. I asked [petitioner] why he knew the police were looking for him.

Q. You asked him why what?

A. Why he knew the police were going to be looking for him.

Q. How did [petitioner] respond?

A. At that time he stated he didn't want to talk anymore and we terminated the interview.

(Tr. 4–209).

The SJC found there "was no error in this line of questioning." *Commonwealth v. Martinez,* 726 N.E.2d at 928. More specifically, the court reasoned that the testimony was properly admitted in order to prevent confusion by the jury about why the interview ended abruptly.[21] *Commonwealth v. Martinez,* 726 N.E.2d at 927.

---

**21.** The SJC noted that:

"A defendant's silence after the police have given the warnings mandated by *Miranda v. Arizona,* 384 U.S. 436, 467–479, 86

S.Ct. 1602, 16 L.Ed.2d 694 (1966), may not be used against that defendant.... [T]o do so would 'penalize' the invocation of the right to silence." *Commonwealth v. Waite,*

The SJC's decision that there was no error was not contrary to clearly established federal law. Neither the rulings in *Doyle v. Ohio*, 426 U.S. 610, 618–619, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), or *Anderson v. Charles*, 447 U.S. 404, 409, 100 S.Ct. 2180, 65 L.Ed.2d 222 (1980), require a contrary result. The holding in *Doyle*, based on due process, prohibits the impeachment of a defendant at trial by reference to his post-arrest, post-*Miranda* silence. *Doyle v. Ohio*, 426 U.S. at 618–619, 96 S.Ct. 2240; *accord Anderson v. Charles*, 447 U.S. 404, 407, 100 S.Ct. 2180, 65 L.Ed.2d 222 (1980) ("[i]n *Doyle*, we held that the Due Process Clause ... prohibits impeachment on the basis of a defendant's silence following *Miranda* warnings"). In *Doyle*, unlike the case at bar, the defendant remained completely silent after being arrested. *See, e.g., Kibbe v. DuBois*, 269 F.3d 26, 37–38 (1st Cir.2001).

The *Anderson* court "ruled that when a defendant makes a post-*Miranda* statement on a particular subject, and then makes a second statement on the same subject at trial, a prosecutor can refer to the post-arrest silence to expose any inconsistencies between the two statements." *Kibbe v. DuBois*, 269 F.3d 26, 37–38 (1st Cir.2001). As explained in *Anderson*, the rule in *Doyle* "does not apply to cross-examination that merely inquires into pri-

or inconsistent statements." *Anderson v. Charles*, 447 U.S. 404, 408, 100 S.Ct. 2180, 65 L.Ed.2d 222 (1980). "Such questioning makes no unfair use of silence because a defendant who voluntarily speaks after receiving *Miranda* warnings has not been induced to remain silent." *Anderson v. Charles*, 447 U.S. at 408, 100 S.Ct. 2180. *Anderson* does not compel a result contrary to the SJC's. Unlike *Anderson*, the trial testimony did not involve the same subject matter or an attempt by the prosecutor to inquire into a prior inconsistent post-*Miranda* statement. This court therefore turns to the unreasonable application prong.

Like the circumstances at issue in *Kibbe*, the facts of this case fall outside the realm of any clearly established Supreme Court precedent in *Doyle* and *Anderson*.[22] Unlike *Doyle*, petitioner waived his *Miranda* rights and voluntarily conducted the interview with Wayne. The recitation of the interview question and petitioner's response that "he didn't want to talk anymore" simply recites the conversation that took place as opposed to issuing a comment on petitioner's post-*Miranda* silence. Accordingly, it is not objectively unreasonable to refuse to extend *Doyle* or *Anderson* to petitioner's case. *See, e.g., Haberek v. Maloney*, 81 F.Supp.2d at 209–211 (finding that similar testimony was not

422 Mass. 792, 797, 665 N.E.2d 982 (1996), citing *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976). *See Commonwealth v. Person, supra* at 140, 508 N.E.2d 88. "Still, in a few situations evidence of silence is properly admitted because it is not 'used against' the accused." *Commonwealth v. Waite, supra* at 798, 665 N.E.2d 982, citing *Commonwealth v. Habarek*, 402 Mass. 105, 520 N.E.2d 1303 (1988), S.C., 421 Mass. 1005, 657 N.E.2d 228 (1995). *Commonwealth v. Martinez*, 726 N.E.2d at 927.

**22.** Indeed, the Supreme Court has "carefully drawn the boundaries of a *Doyle* violation."

*Haberek v. Maloney*, 81 F.Supp.2d 202, 208 (D.Mass.2000). As subsequently emphasized by the Court, "the holding in *Doyle* ... bars *the use* for impeachment purposes of a defendant's postarrest silence." *Greer v. Miller*, 483 U.S. 756, 763, 107 S.Ct. 3102, 97 L.Ed.2d 618 (1987). Thus, there was no *Doyle* violation in *Greer* because the prosecutor "was not allowed to undertake impeachment on or permitted to call attention to Miller's silence." *Greer v. Miller*, 483 U.S. at 764–765, 107 S.Ct. 3102 (internal quotation marks and ellipses omitted). *Greer* militates in favor of finding that the SJC's adjudication was objectively reasonable.

"unreasonable application" of *Doyle* under section 2254(d)(1)).

As previously explained, lower federal court decisions may provide insight and guidance as to the reasonableness of the SJC's decision. *See O'Brien v. Dubois,* 145 F.3d at 25; *Phoenix v. Matesanz,* 233 F.3d at 84 n. 3. The court in *Haberek* exhaustively catalogued the numerous circuit court cases where the "direct testimony by a police officer (as part of the prosecution's case-in-chief) which refers to a defendant's silence or invocation of the Fifth Amendment, is often not considered a violation of *Doyle.*" *Haberek v. Maloney,* 81 F.Supp.2d at 210 n. 1. These decisions, like the Supreme Court's decision in *Greer,* strongly weigh in favor of finding that the SJC's application of *Doyle* was not only objectively reasonable but also constitutionally correct.

For example, the Seventh Circuit concluded that no *Doyle* violation occurred where the agent simply testified that the defendant stated, " 'he didn't wish to say anymore.' " *Lindgren v. Lane,* 925 F.2d 198, 201 (7th Cir.1991). The SJC's conclusion that not every reference to a defendant's silence constitutes a violation of *Doyle* is reasonably consistent with the facts inasmuch as the only reference to petitioner's silence occurred in the context of justifying the reason for concluding a police interview as opposed to impeaching petitioner's trial testimony outside the realm of a prior inconsistent statement on the same subject matter. *See Grieco v. Hall,* 641 F.2d 1029, 1033 (1st Cir.1981)

(recognizing that *Doyle* does not give "rise to constitutional error in every case in which the prosecutor refers to the defendant's post-arrest silence"); *see also Kibbe v. DuBois,* 269 F.3d 26, 38–39 (discussing *Grieco* as basis for finding state court decision on prosecutorial misconduct claim objectively reasonable). In sum, the SJC's finding no error in the testimony at issue was objectively reasonable, particularly in light of the Supreme Court's decision in *Greer* and the lower court decisions cited in *Haberek,* 81 F.Supp.2d at 210 n. 1.

■ Petitioner next asserts that the prosecutor repeatedly and inappropriately forced him to comment on the veracity of another witness, Gaulin. One question asked petitioner if he was "saying that Melissa was lying?" [23] Having reviewed Gaulin's testimony, the majority of the prosecutor's questions, however, centered on whether petitioner heard Gaulin's testimony. Respondent argues that the error is not cognizable on federal habeas review because it was solely a state law issue and, in the alternative, the error was harmless.

In his brief, petitioner presented the issue to the SJC solely in terms of state law.[24] (Docket Entry # 22, Ex. 9, pp. 47–49). Citing only Massachusetts cases, all of which rely on Massachusetts law as opposed to federal constitutional law, petitioner urged the SJC to reverse the convictions because the prosecutor improperly asked him to comment on Gaulin's testimony.

---

**23.** The testimony involved a collateral matter, i.e., petitioner's whereabouts a few days before the murder. The full exchange reads as follows:

Q. But you disagree?
A. Oh, definitely, yes. I was at home.
Q. So, relative to your whereabouts on Monday and Tuesday, are you saying that Melissa was lying?

A. No. Maybe·when she was asked if I was home all day, you know, but maybe she said no, but I did sleep there. I always slept there. There was no other place I slept at. That was my apartment. It was Melissa and my apartment. I always slept there. (Tr. 5–106).

**24.** Respondent, however, concedes exhaustion of this claim. (Docket Entry # 21, n. 2).

The SJC likewise decided the issue solely in terms of Massachusetts law. Applying Massachusetts law, as set forth in the decisions of *Commonwealth v. Nunes,* 430 Mass. 1, 712 N.E.2d 88, (1999), and *Commonwealth v. Triplett,* 398 Mass. 561, 500 N.E.2d 262, 264–266 (1986), the SJC found that the prosecutor erred by asking petitioner to testify about Gaulin's credibility as a witness. Because the error involved a collateral matter and primarily involved only asking petitioner whether he heard Gaulin's testimony, " 'the error did not influence the jury, or had but very slight effect.' " *Commonwealth v. Martinez,* 726 N.E.2d at 924.

▮ Thus, the SJC only decided an issue of state law. As previously explained, a federal habeas court cannot correct an error in the state court's recitation and application of state law. *See Hamm v. Latessa,* 72 F.3d at 954. The prosecutorial misconduct claim arises solely under state law lacking "constitutional implications," *Sanna v. Dipaolo,* 265 F.3d at 12, and is therefore subject to dismissal.

▮ Alternatively, applying the stricter pre-AEDPA standard of review because the SJC did not address the merits of a federal constitutional claim, *see Fortini, III v. Murphy,* 257 F.3d 39, 44 (1st Cir. 2001), the error, if any, did not rise to the level of a violation of the Constitution or other applicable federal law. Although improper under federal common law, *see, e.g., United States v. Fernandez,* 145 F.3d 59, 63–64 (1st Cir.1998), the error did not amount to prosecutorial misconduct in violation of the Due Process Clause.

▮ The appropriate standard on habeas review of a claim of prosecutorial misconduct is "the narrow one of due process." *Donnelly v. DeChristoforo,* 416 U.S. 637, 642, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974). Thus, "[I]t 'is not enough that

the prosecutor's remarks were undesirable or even universally condemned.' " *Darden v. Wainwright,* 477 U.S. 168, 181, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986). Rather, "The relevant question is whether the prosecutor's comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.' " *Darden v. Wainwright,* 477 U.S. at 181, 106 S.Ct. 2464 (quoting *Donnelly v. DeChristoforo,* 416 U.S. at 643, 94 S.Ct. 1868); *accord Porter v. Kelly,* 2000 WL 1804545 at * 4 (E.D.N.Y. Dec. 5, 2000) (improper remarks by prosecutor rise "to the level of a constitutional violation only where the 'remarks are so prejudicial that they rendered the trial in question fundamentally unfair' ").

In the case at bar, the question did not implicate a specific right of the accused, such as the right to remain silent or the right to counsel. *See Darden v. Wainwright,* 477 U.S. at 182, 106 S.Ct. 2464. Rather, the question simply asked petitioner to comment on the testimony of another witness, an area exclusively within the province of the jury. *See generally United States v. Boyd,* 54 F.3d 868, 871 (D.C.Cir. 1995) (recognizing that determinations of credibility reside with jury and, for that reason, a prosecutor should not "induce a witness to testify that another witness, and in particular a government agent, has lied on the stand"). The majority of the questions were even less objectionable because, reviewing the transcript, they primarily involved whether petitioner had heard Gaulin's testimony. Furthermore, the questions concerned a collateral matter. Consequently, the questioning and testimony did not infect the trial with the necessary degree of unfairness to constitute a due process violation.

▮ The same analysis applies to petitioner's next claim of prosecutorial misconduct. Petitioner submits that the prosecutor devoted three pages of testimony to

developing a missing witness inference. (Tr. 5–108–110). Respondent maintains that the error, if any, involved an error of Massachusetts evidentiary law which cannot furnish a basis for habeas relief.[25] Respondent also argues that the error was not contrary to or an unreasonable application of clearly established law as determined by the Supreme Court.

Petitioner's brief to the SJC relied only on state cases interpreting Massachusetts law. (Docket Entry # 22, Ex. 9, pp. 49–51). The SJC interpreted the claim as arising under Massachusetts law. *Commonwealth v. Martinez*, 726 N.E.2d at 926. In denying the claim, the SJC construed and applied state law. Its application of state law did not, as discussed below, implicate the Due Process Clause. Hence, the claim is not subject to federal habeas review.

To the extent the claim alleges an error of federal constitutional law, it fails on the merits under the pre-AEDPA standard of review.[26] Reviewing the transcript, the testimony at issue concerned an employment application petitioner procured the day before the murder at a local fire extinguishing business. The only question conceivably raising a missing witness inference occurred when the prosecutor asked petitioner whether he knew if the person who conducted the interview was "still around." (Tr. 5–110).

It is true that the circumstances did not warrant a remark by the prosecutor regarding the missing interviewer or manager. There is no basis to infer that the interviewer had material or relevant information regarding the murder or the possession of the unlicensed firearm. Furthermore, the prosecution knew the name of the local business. The manager was not under petitioner's control but, instead, was equally available to the prosecution.

The prosecutor's remark, however, did not "so infect the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. at 181, 106 S.Ct. 2464. It involved an immaterial matter. As such, the remark did not infect the trial with any significant degree of unfairness.

■■■■ The prosecutor's isolated question did not implicate any specific right of petitioner. The use of a missing witness instruction does not implicate any constitutional rights of a petitioner or shift the burden of proof. *Niziolek v. Ashe*, 694 F.2d 282, 291–292 (1st Cir.1982); *accord Green v. Scully*, 840 F.Supp. 254, 255–256 (S.D.N.Y.1993). It may be true that a prosecutor's comment about the absence of a missing witness may rise to the level of a constitutional error when "phrased to call attention to a defendant's own failure to testify." *Johnson v. Spalding*, 510 F.Supp. 164, 169 (E.D.Wash.1981). The prosecutor's statement, however, cannot be construed as an impermissible comment on petitioner's failure to testify where, as here, petitioner voluntarily took the stand. *See, e.g., Johnson v. Spalding*, 510 F.Supp. 164 at 170.

In sum, the prosecutorial misconduct claim regarding the missing witness inference concerns the SJC applying state law and, as such, is not subject to federal habeas review. Nor does the error rise to

---

**25.** Respondent concedes exhaustion of ground three. (Docket Entry # 21, n. 2).

**26.** Although respondent maintains that section 2254(d)(1) review applies, this court disagrees. The SJC did not decide the issue of whether the prosecutor's comments violated federal constitutional law. Because the SJC did not address the federal claim, the AEDPA standard of review under section 2254(d)(1) does not apply. *Fortini, III v. Murphy*, 257 F.3d at 44.

the level of a violation of the Constitution, laws or treaties of the United States.

▆ As a further and final example of prosecutorial misconduct, petitioner points to the prosecutor's cross examination question asking him if he could produce the exculpatory clothes that he wore the night of the murder. Petitioner contends that the question about the missing clothes, which the prosecution allegedly possessed, improperly shifted the burden of producing evidence to petitioner.

Respondent maintains that the claim is in procedural default. He also asserts that the improper question only involved an error of state law. Alternatively, respondent argues that the error, if any, was harmless.

Placing the testimony in context, Jaquay Abreu testified that the perpetrator wore dark blue pants and a dark, hooded sweatshirt. (Tr. 2–168, 170 & 172–174). In contrast, petitioner testified that he wore light blue, stone washed jeans; a white T-shirt with the statement "We are the World" on the back; and a pair of Reebok sneakers at the time of the homicide. (Tr. 5–68–69). Although the prosecutor had at least the T-shirt in her possession or control, she nevertheless asked petitioner, "Did you bring with you today the Reebok sneakers, the stone washed jeans, or the white T-shirt you had on?" (Tr. 5–118). Almost immediately thereafter, however, the prosecutor dispelled any doubt as to the inference that petitioner could not produce the exculpatory clothes by introducing the white T-shirt into evidence. (T. 5–126). Noting defense counsel's failure to object to the question and then reviewing the issue under the miscarriage of justice standard, the SJC considered the question improper but found that the question did not impermissibly shift the burden of producing exculpatory evidence onto petition-

er. *Commonwealth v. Martinez*, 726 N.E.2d at 924–925.

Respondent submits that the claim is in procedural default. Respondent asserts that the SJC did not waive enforcement of the Massachusetts contemporaneous objection rule and that petitioner fails to demonstrate cause for the default and actual prejudice. This court agrees.

▆ A long standing rule bars federal courts from reviewing state court decisions that rest on "independent and adequate state ground[s]." *Trest v. Cain,* 522 U.S. 87, 88, 118 S.Ct. 478, 139 L.Ed.2d 444 (1997); *see also Torres v. Dubois,* 174 F.3d 43, 45–46 (1st Cir.), *cert. denied,* 528 U.S. 898, 120 S.Ct. 231, 145 L.Ed.2d 194 (1999). The doctrine bars a federal court from "reviewing federal questions which the state court declined to hear because the [petitioner] failed to meet a state procedural requirement." *Brewer v. Marshall,* 119 F.3d 993, 999 (1st Cir.1997); *see also Burks v. Dubois,* 55 F.3d 712, 716 (1st Cir.1995) (federal habeas review generally precluded "when a state court has reached its decision on the basis of an adequate and independent state-law ground").

▆ "A defendant's failure to object in a timely manner at his state criminal trial may constitute an adequate and independent state ground sufficient to trigger the bar rule so long as the state has a consistently applied contemporaneous objection requirement and the state court has not waived it in the particular case by resting its decision on some other ground." *Burks v. Dubois,* 55 F.3d at 716 (citing *Wainwright v. Sykes,* 433 U.S. 72, 87, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977)). The Massachusetts contemporaneous objection rule, *see* Mass. R.Crim. P. 22, is "firmly entrenched," *Brewer v. Marshall,* 119 F.3d at 1001; *accord Puleio v. Vose,* 830 F.2d 1197, 1199 (1st Cir.1987), and therefore consistently enforced. Furthermore, the

SJC's review of the claim under the miscarriage of justice standard amounts to "a state law review and does not constitute a waiver of procedural default." *Ortiz v. Dubois,* 19 F.3d 708, 714 n. 6 (1st Cir.1994) (paraphrasing *Tart v. Commonwealth of Massachusetts,* 949 F.2d 490, 496 (1st Cir. 1991)). In other words, the SJC's review went not to the federal constitutional question but, rather, to "the state law question of whether a substantial risk of a miscarriage of justice was present." *Puleio v. Vose,* 830 F.2d at 1200 (internal quotation marks omitted).

■ The claim therefore presents a " 'classic example of a procedural default.' " *Brewer v. Marshall,* 119 F.3d at 1001 ("cases where defense counsel fails to make a timely objection, the state does not waive the objection, and the appellate decision rested on that ground" constitute " 'classic example[s] of a procedural default' "). In such circumstances, the petitioner can only succeed "by showing cognizable cause for, and cognizable prejudice from, his procedural default or, alternatively, by demonstrating that the federal court's failure to address the claim on habeas review will occasion a miscarriage of justice." *Brewer v. Marshall,* 119 F.3d at 1002. The petitioner "has the burden of proving both cause and prejudice." *Burks v. Dubois,* 55 F.3d at 716.

■ As to cause, ordinarily the petitioner must "show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule."[27] *Murray v. Carrier,* 477 U.S. 478, 488, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986); *accord Burks v. Dubois,* 55 F.3d at 716–717 (citing *Murray v. Carrier,* 477 U.S. at 488, 106 S.Ct. 2639);

*Magee v. Harshbarger,* 16 F.3d 469, 471 (1st Cir.1994) (quoting *Murray v. Carrier,* 477 U.S. at 488, 106 S.Ct. 2639). No external or objective factor prevented petitioner from providing a contemporaneous objection. Nor was trial counsel ineffective for failing to object to the prosecutor's question. Petitioner fails in his burden of showing cause. Inasmuch as petitioner fails to show cause, this court need not address the prejudice prong. *See Magee v. Harshbarger,* 16 F.3d at 472 (declining to address prejudice prong "[b]ecause the cause and prejudice requirement is conjunctive"); *see also Burks v. Dubois,* 55 F.3d at 716 n. 3 (not addressing prejudice prong because court found no cause).

■ Notwithstanding the absence of cause, a federal habeas court may proceed to address the merits and grant the writ "where a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Murray v. Carrier,* 477 U.S. at 496, 106 S.Ct. 2639; *see Burks v. Dubois,* 55 F.3d at 717–718. Stated otherwise, "[e]ven absent a showing of cause and prejudice," a federal court "may overlook a procedural default and hear a barred constitutional claim on the merits if its failure to do so would result in a fundamental miscarriage of justice." *Burks v. Dubois,* 55 F.3d at 717.

■ The record belies a claim of actual innocence. Jaquay Abreu, familiar with petitioner's voice, recognized petitioner as one of the three men at the murder scene. From her apartment window, she saw petitioner pull out a gun and fire it twice at her husband. She identified the instrument as the silver gun her husband had given petitioner a few days before the

---

**27.** For example, two such objective impediments consist of "showing that the factual or legal basis for the claim was not reasonably available to counsel or that some interference by officials made compliance impracticable." *Murray v. Carrier,* 477 U.S. 478, 488, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986) (citations and internal quotation marks omitted).

murder. Gaulin, although impeached, testified about the inculpatory statements petitioner made on the night of the murder. Petitioner placed himself at the scene of the murder by testifying that he was knocking on the door of his father's apartment at the time. Petitioner also had a motive in light of his arguments with the victim about the gun and the cocaine during the days leading up to the shooting.

In short, petitioner's procedural default bars federal habeas review of the claim that the prosecutor improperly shifted the burden of producing exculpatory evidence onto petitioner.[28]

## C. *Grounds Two and Five*

 Petitioner contends that trial counsel's failure to object to the five alleged errors of prosecutorial misconduct detailed in ground three, considered cumulatively and/or separately, amount to ineffective assistance of counsel. (Docket Entry # 20, ¶ 12(B)); Docket Entry # 18, ¶ II(E). The memorandum in support of the petition additionally argues cumulative prejudice in the prosecutor's improper attacks on petitioner's credibility.[29] (Docket Entry # 18, ¶ II(E)). This court disagrees.

 "Absent any particularized error, there can be no cumulative error." *Williams v. Drake*, 146 F.3d 44, 49 (1st Cir.1998); *accord Jones v. Stotts*, 59 F.3d 143, 147 (10th Cir.1995); *see also United States v. Stokes*, 124 F.3d 39, 43 (1st Cir. 1997) ("cumulative error is inappropriate when a party complains of the cumulative effect of non-errors"). Cumulative error "analysis evaluates only the effect of matters actually determined to be constitutional error, not the cumulative effect of counsel's actions deemed deficient." *Fisher v. Angelone*, 163 F.3d 835, 853 n. 9 (4th Cir.1998); *see also Villafuerte v. Stewart*, 111 F.3d 616, 632 (9th Cir.1997) (rejecting cumulative effect argument inasmuch as ineffective assistance of counsel claims, considered individually, did not amount to deficient performance or result in prejudice and combined effect of any deficiencies did not result in prejudice); *United States v. Cox*, 83 F.3d 336, 341–342 (10th Cir.1996). Thus, in the event that trial counsel's failure to object to each of the prosecutorial errors, standing alone, was not deficient performance, then the errors, considered cumulatively, cannot amount to a Sixth Amendment violation. *See Fisher*

---

**28.** Accordingly, this court declines to address the remaining arguments in favor of dismissing this ground.

**29.** Liberally construing the pertinent section of the memorandum (Docket Entry # 18, ¶ II(E)), it sets forth both an ineffective assistance of counsel claim due to counsel's failure to object to the prosecutor's improper attacks on petitioner's credibility and, particularly in light of the citation to *United States v. Wolf*, 787 F.2d 1094, 1096 & 1098–1101 (7th Cir. 1986) (claim of prejudicial cross examination of the defendant by prosecutor as well as ineffective assistance of counsel due to failure to object to improper attack), a prosecutorial misconduct claim based on the cumulative prejudice resulting from the improper attacks on petitioner's credibility.

The SJC decided the issue of the cumulative prejudice resulting from the prosecutor's alleged improprieties. In so doing, the SJC rejected the argument on the basis that it did not amount to a miscarriage of justice. The court explained that, "The cumulative error was no more prejudicial than the individual errors, which had minimal impact." *Commonwealth v. Martinez*, 726 N.E.2d at 925. Accordingly, this court examines the claim under the section 2254(d) standard of review.

In contrast, the SJC did not address the cumulative error of the ineffective assistance of counsel due to trial counsel's repeated failure to object to the prosecutor's improper attacks on petitioner's credibility. Accordingly, this claim is reviewed under the pre-AEDPA standard of review. *See Fortini, III v. Murphy*, 257 F.3d at 44.

*v. Angelone,* 163 F.3d at 852. The combined or individual effect of the prejudice likewise does not amount to ineffective assistance of counsel. *See Villafuerte v. Stewart,* 111 F.3d at 632; *see also Gonzales v. McKune,* 247 F.3d 1066, 1077–1078 (10th Cir.2001) (assessing deficient performance individually and prejudice cumulatively).[30]

Turning to the ineffective assistance of counsel claim, trial counsel's failure to object to each prosecutorial error, considered individually with respect to each error, did not fall below the standard of objective reasonableness. Nor did each failure result in prejudice. In addition, the cumulative effect of any prejudice did not create "a reasonable probability that, but for counsel's error, the result of the proceedings would have been different." *Smullen v. United States,* 94 F.3d at 23.

Trial counsel's failure to object to the prosecutor's first two questions to petitioner at the outset of cross examination was not deficient performance. To the contrary, trial counsel's failure to object to the constitutionally correct questions was entirely appropriate. The prosecutor's questions, which occurred on cross examination as opposed to during closing argument, did not amount to constitutional error.

The same is true with respect to the prosecutor's question to Wayne as to the reason for the interview's termination. The question and the response it elicited did not comment on petitioner's post-*Miranda* silence. Rather, the question simply asked Wayne for petitioner's response to an interview question and Wayne's response recited petitioner's statement that he did not want to talk anymore. As such,

the question was not a readily apparent *Doyle* violation.

Furthermore, objecting to the question may only have served to emphasize the reason for the interview's termination to the jury. Trial counsel's decision not to object and to emphasize petitioner's refusal to answer more questions might well " 'be considered sound trial strategy.' " *Strickland v. Washington,* 466 U.S. at 689, 104 S.Ct. 2052.

The failure of trial counsel to object to the prosecutor's alleged vouching questions posed to petitioner also did not fall below the standard of reasonably effective assistance. The underlying subject matter of the questions involved collateral matters regarding petitioner's whereabouts in the days prior to the murder. Even if a few of the prosecutor's questions were improper, trial counsel's failure to object to such questions did not amount to deficient performance.

Trial counsel's lack of objection to the missing witness inference concerned an even more collateral matter, i.e., the failure of petitioner to produce the missing manager or interviewer. The benign nature of the testimony belies any need to object to the questioning.

Trial counsel also failed to object to the prosecutor's question to petitioner regarding the clothes he wore on the day of the murder. The failure, however, did not prejudice petitioner. He received a fundamentally fair trial and the failure to object is not sufficient to undermine the confidence in the outcome. Like the SJC, this court is confident that the jury understood that petitioner did not bear the burden to pro-

---

**30.** Because this court rests its decision both on the absence of a constitutionally deficient performance in a number of the allegations and the combined as well as separate effect of any resulting prejudice, this court need not address the split in circuits regarding whether to consider the prejudice component cumulatively even where, individually, the court found no prejudice.

duce the exculpatory clothing. *See also Strickland v. Washington*, 466 U.S. at 694, 104 S.Ct. 2052 (in determining prejudice, court presumes "judge and jury acted according to law"). The trial judge correctly charged the jury that the burden "remains totally with the Commonwealth, and 'never shifts to the defendant.'" (Tr. 5–203); *Commonwealth v. Martinez*, 726 N.E.2d at 924. The prosecutor introduced one of the items of clothing thereby negating any inference that petitioner failed to produce that item. Even if trial counsel had objected, there is no reasonable probability that the result would have been different.

Finally, even assuming deficient performance with respect to the last three alleged deficiencies, there was no cumulative or individual prejudice. The subject matter of the testimony involved collateral matters as opposed to the events occurring on the night of murder. The errors did not alter the evidentiary picture. *See Strickland v. Washington*, 466 U.S. at 695–696, 104 S.Ct. 2052. The trial judge and the prosecutor ameliorated the effect of the last error. *See generally United States v. Sepulveda*, 15 F.3d 1161, 1196 (1st Cir.1993) (cumulative error requires consideration "against the background of the case as a whole, paying particular weight to factors such as ... how the district court dealt with the errors as they arose (including the efficacy—or lack of efficacy—of any remedial efforts)"). Moreover, the Commonwealth had a relatively strong case given the presence of a motive and Jaquay Abreu's testimony that she witnessed petitioner shoot the victim. Considered in the aggregate, petitioner

fails to show a reasonable probability that without the errors the decision reached would have been different. *See Strickland v. Washington*, 466 U.S. at 696, 104 S.Ct. 2052.

Turning to the cumulative error claim regarding the prosecutor's alleged improper attacks on petitioner's credibility, the SJC's decision was not contrary to or an unreasonable application of clearly established law as determined by the Supreme Court. The SJC identified the correct principle, i.e., that non-errors do not collectively create cumulative error. Its application of the principle was not an unreasonable application of this principle particularly in light of the aforementioned weaknesses of the underlying individual claims of prosecutorial misconduct.

### D. *Ground Six*

■ In ground six, petitioner alleges that the trial judge's improper admission of Officer Kevin P. Sullivan's testimony regarding prior consistent statements made by Jaquay Abreu at the police station, where the statements were reduced to writing, violated the hearsay rule. (Tr. 3–185–189).[31] Petitioner does not, however, explain how this evidentiary error, if any, violated his federal constitutional rights.[32] (Docket Entry # 18).

The testimony involved Jaquay Abreu's identification of petitioner as the assailant. Because Jaquay Abreu made an in court identification of petitioner and was available for cross examination, Officer Sullivan's recitation of her prior, out of court identification of petitioner does not violate

---

**31.** Although petitioner does not cite transcript pages, he describes the statement as covering "three pages of transcript." (Docket Entry # 18, p. 23). The substance of the description (Docket Entry # 18, p. 23) verifies that petitioner objects to Officer Sullivan's recitation of Jaquay Abreu's statements at the police

station as opposed to earlier at the hospital on the night of the murder.

**32.** Petitioner simply alleges that the ruling resulted in "a substantial showing of denial of Federal Rights." (Docket Entry # 18, p. 24).

either Massachusetts, *see Commonwealth v. Schand,* 420 Mass. 783, 653 N.E.2d 566, 574–575 (1995), or federal evidentiary law. *See* F.R.E. 801(d)(1)(C).

 The SJC considered part of the recitation hearsay, however, because it went beyond Jaquay Abreu's extrajudicial identification. In particular, Officer Sullivan testified not only about Jaquay Abreu's identification of petitioner and what he wore but also about her description of two shots being fired, how her husband leaned back into the motor vehicle after the first shot, how the vehicle rolled slightly forward, what the other assailants wore and how she believed petitioner's father was in the area. (Tr. 3–187–189).

Petitioner's brief to the SJC presented the argument solely in terms of state evidentiary law. The SJC understood the claim as such. *See Commonwealth v. Martinez,* 726 N.E.2d at 922–923. Inasmuch as this court does not sit to review state errors in the application of state evidentiary law, habeas relief is unavailable under ground six.

 Alternatively, to the extent the SJC addressed any alleged violation of petitioner's rights under the Confrontation Clause,[33] the decision was not contrary to or an unreasonable application of clearly established Supreme Court precedent under section 2254(d)(1). Petitioner had ample opportunity to cross examine Jaquay Abreu as well as Officer Sullivan at trial.

---

**33.** In the context of explaining the proper standard of review, the SJC noted that petitioner's "confrontation right was not implicated by the admission of" Officer Sullivan's testimony because Jaquay Abreu "was available for cross-examination." *Commonwealth v. Martinez,* 726 N.E.2d at 929 n. 7.

**34.** Any objections to this Report and Recommendation must be filed with the Clerk of Court within ten days of receipt of the Report

*See generally United States v. Owens,* 484 U.S. 554, 560–564, 108 S.Ct. 838, 98 L.Ed.2d 951 (1988).

### CONCLUSION

In accordance with the foregoing discussion, this court **RECOMMENDS**[34] that the petition be **DISMISSED**.

and Recommendation to which objection is made and the basis for such objection. Any party may respond to another party's objections within ten days after service of the objections. Failure to file objections within the specified time waives the right to appeal the order. *United States v. Escoboza Vega,* 678 F.2d 376, 378–379 (1st Cir.1982); *United States v. Valencia–Copete,* 792 F.2d 4, 6 (1st Cir.1986).